**UNITED STATES of America, Plaintiff,**

v.

**LONG ISLAND JEWISH MEDICAL CENTER and North Shore Health System, Inc., Defendants.**

**No. CV 97–3412(ADS).**

United States District Court, E.D. New York.

Oct. 23, 1997.

U.S. Department of Justice, Antitrust Division, Washington, D.C. by Steven Kramer, Mark J. Botti, Michael S. Spector, Richard S. Martin, Thomas Horton, David C. Jordan, William F. Berlin, John P. Wunderil, Gregory Asciolla, Trial Attorneys, Antitrust Division, for U.S.

Collier Shannon Rill & Scott, Washington, D.C., William Bradford Reynolds, James F. Rill, Jeffrey W. Brennan, Mary Jean Fell, Paul Cuomo, of Counsel, for Defendants Long Island Jewish Medical Center and North Shore Health System, Inc.

Winston & Strawn, New York City, Anthony J. D'Auria, Michael Sibarium, Jay Levine, Frank Supik, Pamela A. Rons, of Counsel, for Defendant North Shore Health System, Inc.

Stroock & Stroock & Lavan, New York City, Bruce H. Schneider, Albert M. Appel, Edward P. Grosz, Woo Jung Cho, Claude Szyfer, of Counsel, for Defendant Long Island Jewish Medical Center.

## MEMORANDUM DECISION AND ORDER

SPATT, District Judge.

According to one hospital chairman, "one of every seven dollars spent in the United States, one trillion dollars, is spent on health care." (Tr. at 1872).[1] In the past decade, the soaring cost of health care has inspired new and innovative methods of providing more affordable medical treatment. Included in these new methods are the full panoply of managed care organizations, affiliated hospitals and alternative outpatient facilities. Managed care companies of various types, sell health plans to employers, unions, governmental bodies and individuals, providing their members with a network of physicians, hospitals and other health care providers. Another sign of the times is the proliferation of hospital mergers. Hospitals form together to achieve savings in costs, provide more diverse medical services and increase their bargaining power with the managed care organizations. "Indeed, the need for merger and consolidation has become more pressing in light of the drastic changes imposed upon the cost structure of the health care industry."[2]

Further complicating this fast-evolving health care economic picture is the deregulation of hospital rates by the State of New York, which was effective January 1, 1997. The impact of this deregulation was to greatly intensify the competition between hospi-

---

1. Tr. refers to the trial transcript.

2. Antitrust Challenges to Non–Profit Hospitals— Mergers Under Section 7 of the Clayton Act, 21 Loyola Univ. L.J. 1231 (1990).

tals, physician groups, managed care plans and consumers to negotiate hospital rates and to obtain patients.

These burgeoning, multifaceted and diverse managed care plans contract with huge numbers of consumers *en masse*, including large corporate employers and unions. This presents the question of identifying the "consumers" of medical care; namely, are the consumers in this antitrust context the members of various managed care plans, or are the "consumers" the managed care organizations themselves? Also, what is the relevant geographic market of premier hospitals in a heavily populated urban-suburban area, in this case Queens. Nassau and Suffolk Counties, in the shadow of the world-renown hospitals located in Manhattan? These questions are among the many complex issues facing the Court in the resolution of this antitrust litigation.

In this case, the defendants Long Island Jewish Medical Center ("LIJ") and North Shore Health Systems, Inc. ("North Shore" or "NSHS") have agreed to merge. The United States of America (the "Government" or the "plaintiff") commenced this antitrust action to prevent this merger. The Government alleges that the proposed merger "may tend substantially to lessen competition in violation of Section 7 of the Clayton Act, as amended, 15 U.S.C. § 18." The Government seeks the following relief:

1. That the agreement to implement the proposed transaction between North Shore and LIJ Medical Center be adjudged a violation of Section 7 of the Clayton Act, as amended, 15 U.S.C. § 18, and Section 1 of the Sherman Act. 15 U.S.C. § 1;

2. That preliminary and permanent injunctions be issued preventing and restraining the defendants and all persons acting on their behalf from entering into or carrying out any agreement, understanding, or plan, the effect of which would be to allow North Shore and LIJ Medical Center to discuss or agree on terms offered to managed care plans or to negotiate or

contact jointly with managed care plans; . . .

LIJ and NSHS are not-for-profit hospitals. NSHS is made up of nine hospitals, one in Queens County[3], five in Nassau County, two in Suffolk County and one in Staten Island. North Shore Manhasset ("NSM") is the major hospital in the North Shore network. LIJ is located in the most easterly portion of Queens County near its border with Nassau County NSM is located in Manhasset in the northwesterly portion of Nassau County. The two hospitals are approximately two miles apart. The defendants concede that both hospitals are quality teaching hospitals which provide high-level training programs for their physicians, conduct important research in the biomedical sciences, and deliver primary, secondary and tertiary care. (*See* Def. Pre–Hearing Mem. of Law at 2). Inpatient acute care services are generally divided into three categories: primary, secondary and tertiary. Primary/secondary services include all non-complex care including obstetrics. tonsillectomies, pneumonia, gallbladder removal and a variety of general surgical procedures. Tertiary care includes the most specialized, complex and expensive procedures, such as heart surgery, complicated orthopedic surgery, advanced cancer treatment, high risk obstetric services, neonatal care. neurosurgery, and burn care. It is also conceded that, prior to the merger agreement, these two major hospitals were active competitors.

During the hearing conducted by the Court on the plaintiff's motion for a preliminary injunction, the parties agreed that the plenary trial of this action on the merits was to be advanced and consolidated with the hearing. *See* Fed.R.Civ.P. 65(a)(1); *Able v. United States*, 44 F.3d 128, 132 (2d Cir.1995) ("[F]ortunately, Federal Rule of Civil Procedure 65(a)(2), which allows consolidation of a preliminary injunction hearing with a trial on the merits of a permanent injunction, provides a means of ensuring prompt consideration of the full merits of plaintiff's claims rather than the "likelihood" of their suc-

**3.** The Counties of Queens, Nassau, Suffolk, New York or Manhattan and Westchester will be referred to without the "County of" designation.

cess"); *K–Mart Corp. v. Davis*, 756 F.Supp. 62, 63 (D.P.R.1991).

The trial was held from August 11, 1997 to August 27, 1997, a period of thirteen trial days with closing arguments on September 26, 1997. At the trial eighteen witnesses testified and more than 300 exhibits were introduced. Because this decision is rendered on an expedited basis, there is no need to decide the preliminary injunction phase. Rather, the Court will render a decision on the case in chief, namely, the Government's request for a permanent injunction, based on a violation of Section 7 of the Clayton Act, 15 U.S.C. § 18.

## I. *THE TRIAL—FINDINGS OF FACT*

This opinion and order includes the Court's findings of fact and conclusions of law as required by .Fed.R.Civ.P. 52(a) and 65(d). *See Rosen v. Siegel*, 106 F.3d 28, 32 (2d Cir.1997); *Colonial Exchange, L.P. v. Continental Cas. Co.*, 923 F.2d 257 (2d Cir.1991).

### A. *The Hospitals*

Long Island Jewish Medical Center is a not-for-profit voluntary hospital sponsored by the Federation of Jewish Philanthropies. This medical center consists of three institutions: LIJ, a 450 bed acute care adult facility; Schneider's Children Hospital, a 150 bed acute care facility; and Hillside Hospital, a psychiatric wing consisting of 220 beds. Dr. David Dantzker its President and Chief Executive Officer. Dr. Dantzker and others at ·the hospital have described its network as an "anchor site" and as a "premier" hospital.

LIJ is also an academic teaching hospital primarily affiliated with the Albert Einstein School of Medicine, with missions of medical education and research. It is committed to treat all patients "who walk through the door, regardless of their ability to pay or the source of the reimbursement." The profile of the patient population at LIJ as categorized by the types of payer is as follows: 30 percent Medicare, 20 percent Medicaid, 20 percent classic indemnity insurance carriers, and 30 percent various types of managed care insurance carriers.

Fifty percent of the LIJ patient population resides in Queens, thirty percent in Nassau, and the balance in Suffolk, Manhattan and Westchester. The primary competitors of LIJ in the psychiatric field are the Nassau County Medical Center and the Elmhurst Hospital in Queens. In pediatrics, LIJ competes "with almost every hospital on Long Island that has an in-patient pediatric service," which includes most of the hospitals, such as Winthrop University Hospital ("Winthrop") in Nassau, New York Hospital of Queens ("New York Hospital Queens"), Good Samaritan Hospital in Suffolk, and, in addition, the Manhattan hospitals.

North Shore Manhasset opened in 1953. John Gallagher is the President and CEO. He joined the hospital's administrative staff in 1962, when the hospital had 169 beds. Since then, the hospital's capacity has increased to 705 beds. According to Gallagher, NSM has four goals: ·(1) to render the highest quality of care, (2) to become a leading teaching center for Long Island; (3) to continue its commitment to research, and (4) to aid the poor through community service and ·outreach programs. NSM is an academic teaching hospital affiliated with New York University School of Medicine.

The charitable mission of the hospital has been evident since its inception: its clinics opened the very same day as the hospital. Prior to the introduction of Medicaid in 1966, NSM's attending physicians were committed to treating the poor without charge. In addition, the hospital administers 150 to 200 outreach programs, in which NSM personnel go into the community to address health problems and advise on preventive medicine. By state formula, in 1996, NSM· and NSHS spent 33 million dollars and 80 million dollars, respectively, on indigent charity care, representing approximately 7 percent of their gross revenues.

The Board of Trustees of the NSHS is composed of just under 70 members and approximately 250 associate members. The non-denominational trustees come from all walks of life, including business and religious leaders. None of the trustees of either hospital receive any compensation for their work.

The patient profile at NSM is 40 percent Medicare and Medicaid and 30 percent managed care, which increased from 15 percent several years ago. The rest of the patients have commercial insurance companies or are self-payers.

In terms of the services provided, an important consideration in this case, approximately 80 to 85 percent of the services provided by NSM and LIJ are primary/secondary services, which also are provided at all the community hospitals in Queens and Nassau. The remaining services are for tertiary care.

## B. *The Historical Context: The Rise of Managed Care Organizations and Hospital Mergers*

In this country, in the 1980s and early 1990s, a health care crisis was in the offing. The costs of medical care were skyrocketing. Many people could not afford medical care or insurance. According to Dr. Stuart Altman, a former Government economist specializing in health care, almost eyed, major metropolitan area addressed this problem by encouraging a greater percentage of its population to become insured under "Managed Care Organizations" ("MCOs") (Tr. at 1977–78). An "MCO" is an organized system of health care which, for a defined group of people, provides insurance, payments, and health care services in varying degrees. The MCOs caused remarkable changes wherever they were introduced, largely due to the vast number of patients they covered, enabling the plans to pressure the physicians and hospitals to provide quality care at reasonable prices. In addition, the MCOs developed and promoted alternatives for what is often the most expensive medical cost: inpatient hospital care.

Dr. Altman noted that until recently, New York State did not experience the dynamic changes occurring in the rest of the country. (Tr. at 1977–78). MCOs had not penetrated the New York area, due, in large measure, to the fact such plans were prohibited from negotiating with hospital providers over rates, which were set by the State. As a result, while in other metropolitan areas, for primary and secondary hospital care, MCOs

encouraged their patients to visit one of the available outpatient options, New York patients often were relegated to inpatient hospital care lack of any alternatives. According to Dr. Altman, the result was that New York had the most hospital dependent health care system in the United States. The Court finds Dr. Altman a most credible witness.

In addition to greater frequency of inpatient hospitalization, the average hospital stays in New York were significantly longer than in almost every other major metropolitan area. This combination of higher admissions rates, greater use of the hospitals, and lengthier stays created "nine beds per capita in New York." Even this large volume of hospital beds was insufficient to serve New York's hospital-dependent patient population: occupancy rates in the New York hospitals at times exceeded 100 percent. Occasionally, patients were housed in hallways to accommodate this overflow.

In the late 1980s, the New York State Legislature enacted legislation, which, for the first time, allowed one form of the MCO, the Health Maintenance Organization ("HMO"), the most restrictive form of managed care, to negotiate rates with hospital providers. Other types of MCOs remained subject to regulation, forced to pay the higher, state-negotiated rates and had little economic incentive to compete in New York State. At that time, the HMOs were a small percentage of the hospitals' total business, estimated to be about 5 percent of the payers, and so this legislative change had little impact.

Finally, on January 1, 1997, the State of New York deregulated hospital rates. The results have been remarkable, to say the least. After deregulation, all MCOs, now free to negotiate prices, greatly accelerated their penetration of the New York marketplace. All kinds of managed care blossomed, as demonstrated by the hospitals' increasing participation in managed care. In fact, this trend was already underway prior to deregulation. For example, an April 30, 1996 LIJ report stated that "to date LIJ has active agreements with over 35 managed care entities. In confirmation of the effectiveness of its strategy of managed care contracting,

inpatient dischargees for managed care members *for the first three months of 1996 has surpassed by 35% such activity for all of 1995.*" (Pl.Ex.175) (emphasis in original); (Pl.Ex. 232, November 26, 1996 Report of LIJ Vice President of Finance) (noting an "increasing shift away from commercial insurers and indemnity payers toward managed care."). However, after deregulation, the role of MCOs in New York leaped forward. According to Dr. Michael A. Stocker, President and Chief Executive Officer of Empire Blue Cross and Blue Shield ("Empire"), managed care now constitutes 24 or 25 percent of the health care system in the New York metropolitan area. Dr. Stocker predicted that managed health care would "double in five years ... [and] go to 50 percent penetration." (Tr. at 1183). Of the 4.4 million people Empire insures, about 700,000 are presently in managed care and it is Empire's plan to increase this figure.

Dr. Altman testified hat this emergence and expansion of MCOs has been beneficial, and offered some solutions to the complex health care problems in the New York metropolitan area. Significantly, the MCOs "negotiat[e] hard for rates" and have succeeded in reducing hospital prices "substantially lower than they were in 1996 and before." (*See* Testimony of Howard Gold, Senior Vice President of NSHS, Tr. at 1454). Dr. Altman predicted that rates in New York will continue to decline as a result of MCOs because "patients [are] prized possessions." (Tr. at 1984–85). As Gold stated, "the [MCOs] have the patients." Gold testified that if the MCO does not obtain the right hospital rates, it will "direct patients away from our hospitals, and we would lose business." In effect, the MCO says to the hospital, "Give us the right price and you can see the patients." (Tr. at 1465). Unsurprisingly, in many cases, the MCO has the upper hand in negotiations as to price with the hospitals.

In addition to contracting for reduced hospital rates, the MCOs have contributed to another departure in New York health care: they have partially diverted the patient population from hospital dependency by offering alternative outpatient treatments and by mandating shorter hospital stays. Now, probably for the first time in the area's recent history, there is a surplus of hospital beds.

The decreasing frequency and length of inpatient stays, coupled with the MCOs' negotiation of reduced rates has put great financial pressure on the hospitals. This fiscal strain comes at a time when Medicare and Medicaid payments to hospitals are decreasing. In the past, these programs were generous payers to the hospital but, in Dr. Altman's words. "all that is changing." The recent "balanced budget bill" contains a $116 billion dollar cut in Medicare payments, with health care providers bearing the brunt of it. Over the next six years, Medicare payments to the hospitals will be trimmed by 44 billion dollars. Teaching hospitals will be hardest hit by these budget cuts because they have been the major benefactors of the Medicare program and they will suffer a 20 percent cutback in training payments over the next five years. In addition, all hospital rates for Medicare are frozen, without regard to inflation. LIJ and NSM have not been spared: according to one witness, over the next five years, LIJ will lose more than $88 million dollars and NSM will lose 87 million dollars in Medicare and Medicaid payments.

In a market with a shrinking hospital population, an abundance of empty hospital beds and negotiated reduced rates, hospitals have been compelled to consolidate, merge or affiliate, in order to increase the quality and scope of their services and, most importantly, to decrease costs. Examples include the merger of Beth Israel Medical Center with St. Luke's–Roosevelt Hospital Center (itself the product of a merger), and New York Hospital with Columbia–Presbyterian Medical Center. One such consolidation mechanism is referred to as an integrated delivery system ("IDS"). Saul Katz, Chairman of the Board of NSHS described the purpose of the North Shore IDS as promoting efficiency and stability while combining education, primary, secondary and tertiary care, and the integration of physicians with nursing and home care. Katz characterized the trend toward integrated delivery systems as a "revolution" which cuts costs and increases quality (Tr. at

1879), measures which he believes have been successful at NSHS.

Dr. Stocker, the CEO of Empire, describes an IDS as follows:

A It is an organized group of doctors and hospitals who present in its best form a coherent network of what we call primary care physicians, physicians who see patients on first contact, secondary level care which is usually considered community hospitals, and tertiary care, which is university hospitals, and they present that as an option for people to buy in the marketplace.

So, in the end it is an organized subset of the universe of all the doctors and hospitals in the marketplace.

Q And what is the advantage of this organized subset, if any?

\*　　\*　　\*　.　\*　　\*　　\*

A *It definitely drives down prices, in the end it drives down their costs.*

Q How does it drive down their prices and costs, Doctor?

A ... In other words, they have excess capacity, and since their marginal cost is quite small, they are willing to discount for services. But after they go down beyond their marginal cost, when they get to 25 percent of their total business they have to decrease their cost, not just their prices, but their cost. At that point, you have a more and more efficient delivery system. *They decrease their cost so they can get more patients, more business.*

(Tr. at 1175–77) (emphasis supplied). The theory of the IDS was set forth in a NSM memorandum dated November 11, 1996, as follows:

Competition between for-profit health plans like Oxford and U.S. Healthcare is defining the market and exerting enormous downward pressure on fees for physicians and hospitals. *Our ability to set our own fees has been largely lost.* Only by developing the ability to act in unison to control costs and manage risk can we pro-

vide a buttress against this downward pressure on fees.

(Pl.Ex.119) (emphasis supplied).

Consistent with the trend toward affiliation, North Shore developed an IDS named the North Shore Health Systems by bringing a number of hospitals in with the parent hospital on a broad geographic basis to share services, eliminate duplication and facilitate pool purchases. The NSHS consists of nine hospitals with central purchasing and standardized products, which has resulted in reduced costs. According to one consultant in the medical field, as of November, 1995, NSHS is the largest IDS in New York with 2,450 hospitals beds, 3,500 physicians on its staff and 1.2 billion dollars in revenue. (*See* Pl.Ex. 47). Another example of an IDS is Winthrop's affiliation with South Nassau Communities Hospital and its developing relationship with five Catholic hospitals in Nassau and Suffolk Counties. Also, Stony Brook University Hospital ("Stony Brook") is attempting to develop a network called the Suffolk Coalition which will likely be comprised of three hospitals in the Peconic Bay area. In addition, New York Hospital in Manhattan purchased four hospitals in Queens extending its health care service to patients in Queens, Nassau and Suffolk, where they live and work. There is also competition among the hospitals to affiliate with or purchase physicians' groups. Winthrop and Mt. Sinai Hospitals have acquired such physicians' groups.

According to Dr. Altman, the Manhattan hospitals have not been spared the financial strain which has motivated the metropolitan-area hospitals to merge and affiliate in order to remain competitive. If anything, the pressures are felt more keenly by the Manhattan hospitals which—in addition to bearing the MCOs' negotiation of reduced rates, and Medicaid and Medicare's slashing of payments—have suffered because of their history of enormous spending and consequent bonded indebtedness. As a result, the Manhattan hospitals have aggressively sought patients to fill their beds by "colonizing" Long Island: affiliating, consolidating and reaching out to Long Island institutions. New York Hospital purchased Booth Memorial Hospital

in Queens, now known as New York Hospital Queens. Memorial Sloan–Kettering Cancer Center ("Sloan–Kettering") is establishing local oncology units. Mt. Sinai Medical Center is buying up physician practices on Long Island.

The growth of managed care, negotiated reduced hospital rates, reduction in Medicare and Medicaid payments, shrinking hospital populations and developing affiliations between hospitals has fostered a competition between institutions that has been characterized as "frantic," as demonstrated by the "tremendous amount" of hospital. advertisements in the media (Tr. at 1341; see, e.g., Def.Exhs. CB, CD, CG, CV, ABP).

### C. Competition Among Local Hospitals

Initially, the Court recognizes that North Shore Manhasset and Long Island Jewish are two of the premier hospitals on Long Island. As Robert Wheeler, CEO of northeast operations of United Health Care ("United"), the third largest health care insurer in the United States, covering 25 million persons and 1.1 million New Yorkers, testified, NSM and LIJ arc "must have" hospitals. NSM serves as the "premier hub of the North Shore System" and is "vital for [United's] customer base." (Tr. at 89–91). Further, according to Wheeler, the only other Long Island hospital with the same "cachet" as NSM is LIJ.[4] Indeed, Wheeler went so far as to state that if United had to drop NSM and LIJ, it could not "build a marketable network on Long Island." (Tr. at 95, 98). Consistent with this testimony, Gerard Moran, the Acting Vice President of Labor Relations for the Long Island Rail Road, who is responsible for negotiating health care benefits, stated that accessibility to hospitals is an important consideration in bargaining with the union, which was interested in the "three major hospitals on Long Island ... North Shore, Long Island Jewish and Stony Brook." Connie Poirier, Vice President for Contracting and Network Development and Operations for Empire, testified that LIJ and NSM are the two top "anchor" hospitals in Long Island.

Richard Wildzunas is the Senior Vice President of MagnaCare, an MCO which operates as both a Preferred Provider Organization ("PPO") (a less restrictive form of managed care than an MCO) and an HMO, and procures 80 percent of its business from self-insured trust funds and 20 percent through insurance carriers. He negotiates the contracts with the hospitals. According to Wildzunas, LIJ and NSM are comparable premier tertiary care hospitals. At trial he testified that in order to operate in Long Island, "you have to have one of these facilities in [your] network." Wildzunas testified that although Winthrop offers the same services and quality of services as NSM and LIJ, it is not comparable to those hospitals because it does not have the same reputation as LIJ or NSM. However, he conceded that the reputation of Winthrop is "close" to LIJ and NSM. Roslyn Yasser is the administrator of the District Council 37 Health and Security Plan and Trust. She negotiates health care packages for approximately 300,-000 active workers and 100,000 retirees over the age of 65 and their families. Yasser testified that NSM and LIJ have excellent reputations and are well-utilized. In Yasser's view, there are no other comparable hospitals in Nassau and Queens. She "could not conceive [an] ... arrangement without those two hospitals."

Prior to the proposed merger, NSM and LIJ were fierce competitors. According to Wheeler, this competition "helped ... Managed Care Organizations, sort of keep all parties on their toes." (Tr. at 98–99). Poirier, Empire's chief negotiator, testified that LIJ is an MCO's only alternative to NSM and vice-versa. (Tr. at 284). Similarly, Mario Vangeli, the hospital relations manager for Cigna Healthcare of New York ("Cigna"), which has a small share of the Queens–Nassau market, testified that if neither LIJ nor NSM were in his network. "Cigna would probably lose its current clients and not be able to market to a whole other population in the area." However, Vangeli testified that Winthrop is a large teaching hospital that he perceives "to have a certain respect in the community" and offers the

---

**4.** "Cachet" is roughly defined as prestige or high status.

same tertiary care services as LIJ and NSM. In addition, Vangeli conceded that the Cigna enrollees' admissions to Winthrop exceeded such admissions to both LIJ and NSM. In fact, in 1996, the hospital in Queens and Nassau with the most Cigna admissions was Winthrop. Further, he considers Winthrop to be a "center of excellence" along with LIJ, NSM and Stony Brook. Also, during negotiations with NSM as to cardiac rates, Cigna diverted patients from NSM to Lenox Hill and possibly Winthrop. After that move, NSM agreed to a discount for cardiathoracic surgery.

Dr. Dantzker, LIJ's President and CEO, stated in a February 1995 memorandum that an MCO "will contract with either us or with North Shore Hospital, but not with both." (Pl.Ex.4). Indeed, in December 1995, LIJ sent a letter to the Federal Trade Commission and the Department of Justice complaining that the NSHS acquisitions on Long Island would lessen competition in the health care field. (Pl.Ex.6). In the March 26, 1996 minutes of the LIJ Board of Trustees meeting, Dr. Dantzker predicted the development of two Queens–Long Island health care networks, one "coalescing around North Shore and the other around the Medical Center." (Pl.Ex. 11). Similarly, NSM's Strategic Plan for 1997–1998, prepared on October 11, 1996, prior to the merger discussions, states that NSM "competes primarily with other tertiary care centers, such as LIJ and Winthrop." (Pl.Ex.22).

A major contested issue in this case is whether other hospitals are able to provide similar services to LIJ/NSM in the relevant markets. According to Wheeler, there are several other full service hospitals in the area, such as Winthrop in Nassau, which, although it provides excellent service (Winthrop was ranked as one of the "100 Best Hospitals" in the United States by U.S. News & World Report), lacks the reputation of NSM or LIJ necessary to build a network. Wheeler testified that attempting to form a network around Winthrop would "disrupt those preferences with our physicians and with our patients[,]" thereby causing United to "lose customers." Both Wheeler and Wildzunas testified that a network built

around Manhattan hospitals would be untenable because people generally prefer to be hospitalized where they live. Poirier reached a similar conclusion, namely, that a Manhattan hospital would be an inappropriate anchor, recognizing that "[w]e [Empire] owe our members to receive acute care in their backyard, where their families can visit them, where they feel comfortable, where their physicians practice medicine." (Tr. at 285–86). Wildzunas further stated that Stony Brook would not be a suitable alternative because of its distant location in Suffolk County.

Poirier testified that Winthrop is not a premier hospital because it is "not known as a teaching facilit[y] ... which is clearly reflected in the graduate education medical dollars.... They [the other Long Island hospitals] do not have the history and prestige that the North Shore Manhasset and LIJ names carry." (Tr. at 280–83). Wildzunas, senior negotiator for MagnaCare, similarly stated that although Winthrop offers the same services as NSM and LIJ, it lacks the same reputation, although he conceded that the reputations are "close." Both Wildzunas and Poirier testified that St. Francis Hospital is not comparable because it is a "specialty hospital, not a full service tertiary hospital with the full benefits of a teaching facility." In addition, both contract negotiators stated that New York Hospital Queens and Nassau County Medical Center also lack NSM's and LIJ's reputation, and as a result, could not be considered anchor hospitals.

When asked whether a developing affiliation between Winthrop and the local network of Catholic hospitals (comprised of St. Francis, Mercy, Good Samaritan, St. Charles and Mather hospitals, referred to as "CHNLI"), might be comparable to NSHS or LIJ, Poirier responded in a colorful fashion:

First of all a patch work quilt of hospitals with different levels of clinical skills, you cannot treat or provide the full continuum of care to all patients, LIJ and North Shore on their campuses are full service facilities. So if a member with a brain trauma is at Manhasset, and they have a cardiac problem, there is the full breadth and depth of clinical services available to

that patient under that roof. If you patch work quilted several acute care facilities with different clinical specialties, you would have to put that member in an ambulance and travel around the county to provide the full continuum of care. I consider that not only lack of quality, but irresponsible.

(Tr. at 286).

However, Dr. Stocker, who, as the President of Empire, is Poirier's superior, and is the spokesman authorized to address the public on the company's behalf, believes that Winthrop provides the same services as LIJ and NSM and therefore, is a viable alternative to those hospitals. (Tr. at 1331–377). Further, Dr. Stocker testified that Winthrop and LIJ share a similar reputation, although he concedes that NSM has the most "cachet." Consistent with this opinion, Anthony Watson, Chairman and Chief Executive Officer of the Health Insurance Plan of Greater New York ("HIP"), with 310,000 members in Queens, Nassau and Suffolk, testified that Montefiore Hospital "is the only hospital in a dominant position [as it] controls and dominates the Bronx and lower Westchester as no other hospital in this region does." However, as a member of the Board of Trustees of NSHS, Watson is an interested witness. Nevertheless, as the CEO of one of the major MCOs in the New York metropolitan area, it is Watson's opinion that by merging, LIJ and NSHS are "doing exactly what they should do ... [to] enable them to deliver a better health care product ... [and] a much more cost effective system." (Tr. at 819).

In terms of vital statistics, NSM has 705 beds while LIJ and Winthrop have 591 beds each. In average daily population census, NSM is number one, LIJ number two and Winthrop number three. This ranking also holds true with respect to the number of attending physicians at each hospital. This latter statistic is particularly important because a hospital with a larger number of attending physicians is more likely to have a greater number of patients admitted. With regard to the number of residents, LIJ has the most, with NSM second and Winthrop a close third. In addition, in a statistical analysis of where admitted patients reside (cate-gorized by zip code), NSM had the most patients from a diverse geographical area, with LIJ second and Winthrop third.

With respect to other sources of competition, Dr. Dantzker and Gallagher, the President and CEOs of LIJ and NSM respectively, and Katz, Chairman of the Board of Trustees for NSHS, gave undisputed testimony regarding the increased "colonization" of Long Island by Manhattan hospitals. As an example of this trend, Gallagher traced the extensive expansion of Mt. Sinai by affiliating with St. John's Smithtown in Suffolk, St. John's Hospital in Far Rockaway, Queens General, Elmhurst General, Long Beach Hospital and a number of nursing homes in Nassau and Suffolk. (*See* Def.Ex. CA, Appendix Fig. A). Further, Dr. Dantzker described this significant factor relating to market share and competition, namely, the rapid, growing infiltration of Manhattan hospitals into Queens, Nassau and Suffolk:

Q Do Manhattan hospitals take affirmative steps to attract Queens, Nassau and Suffolk residents?

A Absolutely. I would believe that it is already quite a hot market and it is heating up rapidly. *Manhattan hospitals are clearly looking at Queens, Long Island, as an area of what we call colonization.*

Q And in what ways do they go about this?

A There are a number of ways they have.

The most well recognized ways for them to develop affiliated relationships, or to purchase hospitals out on Long Island and Queens, this is the approach taken by New York Hospital in their purchase of both Flushing Hospital and New York Hospital of Queens, and by Mount Sinai. I am sure everybody has seen the Mount Sinai map of the world with its arrows and flags scattered throughout Queens and Long Island and its affiliated relationships with multiple hospitals in Queens and multiple hospitals in Nassau and Suffolk.

It is also done by the purchase or opening of medical groups. You already heard about Mount Sinai buying the North Shore Medical Group in—I am blocked on the Town.

Q Huntington?

A Huntington.

They also recently opened an ambulatory center in Hewlett, Long Island, which is in the southern parts of Nassau County. It is also done by courting and establishing relationships with physicians on Long Island, such as what was done, for example by Lenox Hill who established good and close relationships for the series of cardiologists out on the east end of Suffolk County, and now send all their cardiac surgical patients into Lenox Hill.

*Speaking of them, they [Lenox Hill] already have opened up an ambulatory center essentially across the street from Long Island Jewish Medical Center to do orthopedics and sports medicine and a number of other areas.*

There is an affiliation between Colombian [sic] Presbyterian Hospital and St. Francis.

There are a number of ways the Manhattan hospitals have used to colonize from a medical standpoint, Queens and Long Island.

(Tr. at 872–74) (emphasis supplied).

Further, Sloan–Kettering recently announced a program with St. Francis and Mercy Hospital to bring its highly sophisticated and advanced cancer care program from Manhattan to Nassau County. This would diversify the health care furnished at St. Francis, which has been predominantly cardiac related. Mt. Sinai is opening a facility for primary care and specialist consultation services in Hewlett, which is in the southern portion of Long Island. Further, as stated above, Winthrop/South Nassau is actively pursuing an affiliation with the five Catholic hospitals on Long Island, which if consummated, would provide a clear competitive threat to a combined LIJ/NSHS entity.

Expanding on this point, Howard Gold, Senior Vice President in charge of NSHS's managed care negotiations, views North Shore's competitors on the primary and secondary care level to be every hospital in Queens, Nassau, Suffolk and Manhattan. On the tertiary care level, he views Winthrop, St. Francis, LIJ, Nassau County Medical Center, Stony Brook and the Manhattan hospitals as competitors. In addition, he places New York Hospital Queens in the latter category because it was purchased by New York Hospital, which is affiliated with Cornell University Medical School, and recently added a cardiac surgery department. In support of this contention that the Manhattan hospitals are colonizing Long Island and providing competition to Long Island hospitals, Dr. Dantzker testified that the Manhattan hospitals advertise "extensively":

Q Do the Manhattan hospitals advertise in media which reach Queens, Nassau and Suffolk residents?

A Endlessly. It is hard to turn on the radio without hearing an ad for one of the Manhattan hospitals. Even I know the number of MD [sic] Sinai. The ads are continuously in the Long Island edition of the New York Times, in Newsday, in all of the local newspapers, television ads. It is a veritable blitz of advertising in this area.

(Tr. at 874).

The Court further recognizes that large numbers of Queens, Nassau and Suffolk residents go to Manhattan hospitals for treatment. This is especially true for the specialty fields of cancer treatment, cardiac surgery and complex orthopedic surgery. For example, in 1996, almost 9,000 patients from Queens, Nassau, and Suffolk were admitted into Manhattan hospitals for cardiac surgery—3,000 from Queens, 3,000 from Nassau and 2,800 from Suffolk. In 1996, according to the testimony of the defendants' expert, Margaret Guerin–Calvert, approximately 50,-000 patients from Queens, Nassau and Suffolk Counties sought primary, secondary and tertiary health care in Manhattan. Other statistics revealed that 15 percent of tertiary care patients from Queens, Nassau and Suffolk were treated at Manhattan hospitals.

### D. *The Consumers*

At trial, the parties disagreed as to the identity of the consumers in the alleged relevant markets. The Government's expert, as to all phases of liability except "efficiencies," was Dr. Gregory S. Vistnes, Assistant Chief Economist at the Anti–Trust Division of the Department of Justice. Dr. Vistnes testified that the consumers are the managed care

plans who "pick the appropriate hospitals for their hospital network ... assemble physicians and other attributes of the provider network ... which they then market or try to sell to their customer." (Tr. at 571 ). Dr. Vistnes elaborated his view that the managed care plans are the "customers" or "consumers":

Q And what are the implications of focusing on the individual patient as the customer of the hospital rather than the managed care plan?

A I feel that by focusing on patients as the customer of the hospital, that that leads to a misleading or inappropriate analysis.

In particular while such a focus may have been appropriate in the past when indemnity plans were prevalent in the marketplace, and the principal means by which individuals were insured. That is no longer the case in today's health care marketplace. *Instead, it is the managed care plan which is driving the hospital's decisions.* It is clear that the managed care plans are the ones driving the hospital's decisions on whether or not, or why they should affiliate or merge. It is the managed care plans who are driving the hospital's decisions on what services they should or should not be offering. And it is managed care plans which are driving hospitals' decisions with regard to price.

Unless one focuses on managed care plans as a factor which is affecting today's marketplace in health care, one cannot come to a reliable conclusion as to the affect of this merger.

(Tr. at 605) (emphasis supplied).

Dr. Vistnes further stated that the "customers are in general the employers and their employees." In sum, Dr. Vistnes testified that the "consumers" were (1) the managed care plans, (2) the employers, and (3) their employees.

On the other hand, Guerin–Calvert, the defendants' antitrust health care expert, testified that the "consumers" are the users of the hospitals' services, namely, the residents of Queens, Nassau and Suffolk. In her view, managed care plans account for less than 30 percent of the payers of hospital services.

Other "consumers" include the Government through Medicare and Medicaid, indemnity insurers, self-insured employers, other employers, private individuals who pay for themselves, and increasingly, physician groups.

■ Given the evidence at the trial, the Court finds that there are five categories of "consumers" in this hospital merger case. First, there are the patients who are either self-payers or have indemnity insurance. Second, there are the physicians and the physician groups who control admissions. Third, there are the managed care plans as described by Dr. Vistnes. Fourth, there are the employers who exert control over the selection of the hospital network. Fifth, there are the Government payers.

### E. *The New York State Attorney General and Department of Health*

After the required pre-merger Hart–Scott–Rodino filing with the Department of Justice ["DOJ"], *see* 15 U.S.C. § 18a, upon request, the hospitals sent to the DOJ some 360 file boxes containing approximately 500,-000 sheets of paper. These documents included the strategic planning reports of both NSHS and LIJ. They were also made available to the Attorney General of the State of New York. The New York State Department of Health also reviewed the merger transaction and, in a letter to the Acting Assistant Attorney General of the DOJ dated June 6, 1997, voiced its strong approval:

To reiterate, the Department of Health believes the planned merger will have positive impact on public health. The ongoing efforts for quality improvement by both institutions will create the potential for achievement in this important area of health care. In addition, the merger offers significant opportunities for eliminating duplication of services, for establishing centers of excellence based on each institution's areas of expertise, and for reforming graduate medical education. Finally, the two institutions have stated their strong commitment to continue provision of services to the indigent. All of these programmatic opportunities, improvements

and efficiencies will benefit the health of the communities served by these institutions. (Def.Ex.OD). In a speech delivered on June 6, 1997, Dr. Barbara DeBuono, the New York State Commissioner of Health, stated that in the current health care environment stand-alone hospitals are obsolete, and as a result, "hospitals that were once fierce competitors are now collaborating [through mergers and other affiliations] to provide care." She further observed that "collaboration and consolidation are taking place" throughout the health care industry, as evidenced by more than 900 mergers and acquisitions in the industry in 1996 alone. She stated that there is a "nationwide trend towards more collaboration, more outpatient services, and more preventive care in health care delivery." (Def.Ex. ABD).

In the face of resistance by the DOJ, in order to move forward with the merger the hospitals offered to compromise. The hospitals agreed to freeze all hospital list prices to commercial payers for inpatient and outpatient rates for a period of two years from the date the merger transaction is consummated, subject to inflationary increases. (*See* Def. Ex. ACF). Katz further explained the commitment: "[T]o make it perfectly clear, we believe this is only a cap. We believe the rates will be lower and continue to be driven down."

In addition, the agreement calls for a contribution to the community from the cost savings that the hospitals envision will result from the merger. While the hospitals' agreement to give back to the community the sum of 100 million dollars over a period of five years has some conditions, they guarantee 50 million dollars in new and incremental programs and services for the community's benefit. Examples of programs and services which would satisfy this commitment to the community include, without limitation, the following:

[C]ommunity [E]ducation [P]rograms

[P]reventive health services, including opening new primary care centers, immunization and lead screening programs for children, mammogram programs, prostate cancer detection programs and school based health programs; ambulatory surgery centers; creating a community based sub-specialty center for children and adults; women's health center for pre-natal and antepartum care: health care outreach for the frail elderly; mental health programs to support geriatric day programs and supervised living; drug and alcohol rehabilitation programs; vocational assessment training; sheltered workshop and supported employment programs; aid to those suffering from child and spouse abuse; providing access to mental health services for the mentally retarded and mentally disabled population; expansion of research into medical treatment and medical outcomes; and development of new clinical programs.

(Def.Ex.ACF).

As a result of this agreement and his own investigation, the Attorney General of the State of New York concluded that the merger "will not impair competition [and] is in the best interest of the State and its citizens", and declined to join the DOJ in the prosecution of this lawsuit.

## II. ADDITIONAL FINDINGS OF FACT—CONCLUSIONS OF LAW

### A. Section 7 of the Clayton Act

While the complaint includes a request for relief under Section 1 of the Sherman Act, 15 U.S.C. § 1, the Court will focus its attention on Section 7 of the Clayton Act, as that law applies equally to both statutes.

 Section 7 of the Clayton Act, 15 U.S.C. § 18 ("Section 7"), provides in part that "no person engaged in commerce ... shall acquire the whole or any part of the assets of another person ... where ... the effect of such acquisition may be substantially to lessen competition, or to tend to create a monopoly." To meet the requirements of Section 7, the Government must show a reasonable probability that the proposed merger would substantially lessen competition in the future. "[T]he current understanding of § 7 is that it forbids mergers that are likely to 'hurt consumers, as by making it easier for

the firms in the market to collude, expressly or tacitly, and thereby force price above or farther above the competitive level.'" *United States v. Rockford Memorial Corp.*, 898 F.2d 1278, 1282–83 (7th Cir.1990) (quoting *Hospital Corp. of America v. FTC*, 807 F.2d 1381, 1386 (7th Cir.1986)); *see also FTC v. Butterworth Health Corp.*, 946 F.Supp. 1285, 1289 (W.D.Mich.1996), *aff'd*, 121 F.3d 708 (6th Cir.1997). The starting point is the defendants' post-acquisition market share. *See Brown Shoe Co. v. United States*, 370 U.S. 294, 343, 82 S.Ct. 1502, 1534, 8 L.Ed.2d 510 (1962) ("market share ... is one of the most important factors to be considered when determining the probable effect of the combination on ... competition in the relevant market").

To determine whether there is a reasonable probability of a substantial lessening of competition, the courts have focused on whether the transaction has the "potential for creating, enhancing, or facilitating the exercise of market power—the ability of one or more firms to raise prices above competitive levels for a significant period of time." *United States v. Archer–Daniels–Midland Co.*, 866 F.2d 242, 246 (8th Cir.1988), *cert. denied*, 493 U.S. 809, 110 S.Ct. 51, 107 L.Ed.2d 20 (1989). As stated by the Supreme Court in *United States v. E.I. du Pont de Nemours & Co.*, 351 U.S. 377, 392, 76 S.Ct. 994, 1005, 100 L.Ed. 1264 (1956):

> Price and competition are so intimately entwined that any discussion of theory must treat them as one. It is inconceivable that price could be controlled without power over competition or vice versa. This approach to the determination of monopoly power is strengthened by this Court's conclusion in prior cases that, when an alleged monopolist has power over price and competition, an intention to monopolize in a proper case may be assumed.

Whether the merger will cause an anti-competitive effect however, is not "the kind of question which is susceptible of a ready and precise answer." *United States v. Philadelphia Nat'l Bank*, 374 U.S. 321, 362, 83 S.Ct. 1715, 1741, 10 L.Ed.2d 915 (1963).

■ Generally, a plaintiff in a Section 7 Clayton Act antitrust matter may establish a *prima facie* case by demonstrating that the merged entity will have a large percentage of the "relevant market," so that it may raise prices above competitive levels. *Id.* at 363, 83 S.Ct. at 1741; *FTC v. Freeman Hosp.*, 69 F.3d 260, 268 n. 11 (8th Cir.1995); *Butterworth Health Corp.*, 946 F.Supp. at 1289–90. In order for a court to determine the effect of a merger on competition, the "relevant market" must first be defined. A "relevant market" consists of two components: a product market, and a geographic market. *See United States v. Marine Bancorporation*, 418 U.S. 602, 618, 94 S.Ct. 2856, 2868, 41 L.Ed.2d 978, (1974) ("[D]etermination of the relevant product and geographic markets is a 'necessary predicate' to deciding whether a merger contravenes the Clayton Act"); *Brown Shoe Co.*, 370 U.S. at 324, 82 S.Ct. at 1523; *Morgenstern v. Wilson*, 29 F.3d 1291, 1296 (8th Cir.1994), *cert. denied*, 513 U.S. 1150, 115 S.Ct. 1100, 130 L.Ed.2d 1068 (1995).

■ Further, the Government must prove that the defendants have "a dominant market share in a *well-defined* relevant market." *Flegel v. Christian Hosp.*, 4 F.3d 682, 689 (8th Cir.1993) (emphasis supplied). "A properly defined market includes potential suppliers who can readily offer consumers a suitable alternative to the defendants' services." *Butterworth Health Corp.*, 946 F.Supp. at 1290; (citing *United States v. Mercy Health Servs.*, 902 F.Supp. 968, 975–76 [N.D.Iowa 1995], *vacated as moot*, 107 F.3d 632 [8th Cir.1997]). The properly defined market excludes those potential suppliers whose product is sufficiently differentiated or too far away, and who are unlikely to offer a suitable alternative. *Id.* at 1290; *Mercy Health Servs.*, 902 F.Supp. at 975–76.

■ The Court further notes that Section 7 "deals in 'probabilities,' not 'ephemeral possibilities.'" *Marine Bancorporation*, 418 U.S. at 622–23, 94 S.Ct. at 2870. "[R]emote possibilities are not sufficient to satisfy the test set forth in § 7." *United States v. Falstaff Brewing Corp.*, 410 U.S. 526, 555, 93 S.Ct. 1096, 1112, 35 L.Ed.2d 475 (1973). "There must be 'the reasonable probability'

of a substantial impairment of competition by an increase in prices above competitive levels to render a merger illegal under § 7. A 'mere possibility' will not suffice." *Fruehauf Corp. v. FTC*, 603 F.2d 345, 351 (2d Cir.1979). In the context of this case, the Government has the burden of identifying the credible properly defined relevant markets, and proving the anti-competitive effects.

■ The courts have recognized that "in certain circumstances, a defendant may rebut the government's *prima facie* case with evidence that the intended merger would create significant efficiencies in the relevant market." *FTC v. University Health, Inc.*, 938 F.2d 1206, 1222 (11th Cir.1991); *Mercy Health Servs.*, 902 F.Supp. at 987; *cf.* FTC Horizontal Merger Guidelines (Revised Apr. 8, 1997) § 4.0 ("[E]fficiencies generated through merger can enhance the merged firm's ability and incentive to compete, which may result in lower prices, improved quality, enhanced service, or new products"). In this regard, the defendants must show that the intended merger itself, rather than any other factor, would result in significant economies and, that these economies ultimately would benefit the consumers. *University Health*, 938 F.2d at 1223. The defendants must establish that the proposed merger enhances rather than hinders competition because of the increased efficiencies. *See United States v. Country Lake Foods, Inc.*, 754 F.Supp. 669, 680 (D.Minn.1990).

This so-called defense is difficult to pursue because the alleged efficiencies are often speculative, and vigorously disputed. In addition, the extent to which these efficiencies would enure to the benefit of the consumer is often difficult to measure. In sum, to sustain an "efficiencies defense," the defendants must clearly demonstrate that the proposed merger itself will create a net economic benefit for the health care consumer.

Applying these standards, the Government has the burden of proof and seeks to: (1) define the relevant product market; (2) define the relevant geographic market; and (3) prove that the merger will be anti-competitive and will result in an increase in prices above competitive levels for a significant period of time.

## B. *The Relevant Product Market*

■ In defining the relevant product market, the Court must consider what products or services a consumer, confronting a price increase, would reasonably substitute for the products or services of the merging parties. If the consumer can reasonably substitute another product or service, then the substitute product or service can be considered part of the relevant product market.

■ The Government contends that the "relevant product market" consists of "the bundle of acute inpatient services provided by anchor hospitals to managed care plans." (Pl. Pre–Trial Memo at 4). On the other hand, the defendants contend that, using the court's "traditional methodology," the relevant product market in this hospital merger case is "general acute care inpatient hospital services." (Def. Pre–Hearing Memo at 8).

"Anchor hospitals," according to the plaintiff, are those having "prestigious reputations, broad ranging and highly sophisticated services, and high quality medical staffs." (Pl. Pre-trial Memo of Law at 7). The plaintiff distinguishes between the "general acute care hospitals" and the major prestigious acute care "anchor" hospitals like NSM and LIJ, which are in "a [unique] market to serve as an anchor hospital for a managed care plan." *Id.* at 10. The plaintiff asserts that "community hospitals are not reasonably interchangeable" with anchor hospitals.

The Government's version of the product market is limited to primary and secondary care and excludes tertiary care provided at the anchor hospitals. Thus, as will be discussed later, the Government is pursuing this Clayton Act Section 7 case based on a claimed anti-competitive price increase of 20 percent only for the primary/secondary services by the merged entity. In this regard, the following testimony by Dr. Vistnes is crucial:

Q Now, you hypothesized a 20 percent price increase by the merged entities after the merger; is that correct?

A Yes, I have.

Q That is not a 20 percent across the board for the whole bundle of services, is it, Dr. Vistnes?

A No, it is not.

Q It covers only non-tertiary services; is that correct?

A Yes, it does—or that is correct.

Q *And do you believe that after the merger of North Shore Manhasset and Long Island Jewish will be monopolist for tertiary care services?*

A *No, I do not.*

(Tr. at 754–55) (emphasis supplied).

The Government's analysis of the relevant product market is flawed in several key respects. Preliminarily, the Court notes that the plaintiff's definition is unduly restricted to "anchor" hospitals. This definition does not comport with that applied in other hospital merger cases, namely, "general acute inpatient services." *Freeman Hospital,* 69 F.3d at 268 (government stipulated that the relevant product market was "acute care inpatient services"); *University Health,* 938 F.2d at 1210–11 (relevant market is "the provision of in-patient services by acute-care hospitals in the Augusta area"); *Rockford Memorial Corp.,* 898 F.2d at 1284 (relevant market is "the provision of inpatient services by acute-care hospitals"); *Butterworth Health Corp.,* 946 F.Supp. at 1290–91 (relevant product market is "general acute care inpatient hospital services" and "primary care inpatient services"); *Mercy Health Servs.,* 902 F.Supp. at 976 (government stipulated that the relevant product market was "acute care inpatient services"); *United States v. Carilion Health System,* 707 F.Supp. 840, 842 (W.D.Va.), (relevant product market is "acute inpatient hospital services and certain outpatient healthcare services provided by various clinics"), *aff'd without written opinion,* 892 F.2d 1042 (4th Cir. 1989). It is interesting to note that Dr. Vistnes used the same relevant product market in a Florida case in which he testified for the Government. (Tr. at 702–03).

However, even if the Court were to ignore the weight of authority in this particular urban-suburban locality, the Government has failed to establish that the acute inpatient services produced at these so called "anchor hospitals" are unique and would support its own relevant product market. As set forth above, approximately 85 percent of the services provided by LIJ and NSM involve primary and secondary care. The evidence is clear that these services are offered by numerous other hospitals in Nassau and Queens. The Court finds that with regard to primary and secondary care services, LIJ and NSM competes with the community hospitals in Nassau and Queens, such at Mercy, Mid–Island and South Nassau Community in Nassau and Elmhurst Hospital Center, Flushing Medical, Peninsula Hospital Center and St. John's Episcopal in Queens. Further, in the same area, Winthrop and New York Hospital Queens provides substantially all of the services offered by LIJ and NSM, including tertiary care. In addition, there is another major tertiary care hospital in the relevant product market, namely, the Nassau County Medical Center located in East Meadow.

The Government's position based on an "anchor hospital" monopoly did not materialize in Suffolk County, where it is conceded by all parties that the only anchor hospital's Stony Brook University Hospital. Under the Government's theory, Stony Brook would be in a position to raise prices in an anti-competitive manner. However, the evidence revealed that Stony Brook was and is charging competitive prices.

Indeed, in the Court's view, the Government essentially concedes this point. Rather than argue that these services are unavailable elsewhere, the plaintiff maintains that the "reputation" of LIJ and NSM is what separates them from the crowd. The main support for this proposition is the testimony of certain Government witnesses such as Poirier, Empire's Vice President who testified that LIJ and NSM are the only two hospitals in Nassau and Queens which share a prominent "reputation." The problem with this "reputation" evidence is that it is based on "perception" of where patients currently go, rather than where they could practically go for acute care inpatient services in the future. The more material question is not the present customer's perception of the avail-

able hospital care, but the future likelihoods. The "perceptions" by market participants and the subject of where patients currently prefer to go, was discussed in *Freeman:*

> In summary the FTC's expert testimony addressed only the question of where patients currently go, rather than where they could practicably go, for acute care inpatient services. The bulk of the testimony from market participants suffered from a similar defect, since it spoke only to present competitor perceptions of the geographic market and present customer preferences in seeking health care.

*Freeman,* 69 F.3d at 271.

The lack of weight of this evidence was driven home by the testimony of Dr. Stocker, who serves not only as Empire's President and CEO, but as Poirier's direct superior. According to Dr. Stocker, whose testimony the Court credits, NSM and LIJ compete with many other entities as to all acute inpatient care. With regard to primary/secondary care, which is the lion's share of their business, the defendant hospitals compete with all local health care institutions including teaching hospitals such as Winthrop, the community hospitals in Queens and Nassau, and the Nassau County Medical Center, a large municipal hospital. In this regard, the Court notes that, in Queens County, aside from LIJ and the Queens hospital in the NSHS, there are ten general acute care hospitals that supply all or most of the services provided by LIJ and NSM. Many of these hospitals provide some tertiary care. (Def.Ex.YG). These hospitals include Elmhurst General with 516 beds; New York Hospital Queens with 487 beds; Flushing with 415 beds; and St. John's Episcopal with 314 beds. In Nassau County, other than the hospitals in the NSHS, there are eight general acute care hospitals that supply all or many of the services provided by LIJ and NSM, including some tertiary care services. *Id.* These hospitals include Nassau County Medical Center with 1,384 beds; Winthrop with 518 beds; Hempstead General with 464 beds; South Nassau Communities with 429 beds; Long Beach Medical Center with 390 beds; and Mercy with 387 beds.

The defendant hospitals also compete with the recently "colonized" medical outposts of the Manhattan hospitals, such as the local oncology facilities opened by Sloan–Kettering and the physician practices purchased by Mt. Sinai. (*See* Tr. at 706–07, 711, 1193–94, 1316–18, 2077). One of the most striking examples of competition resulting from this colonization is the recent purchase of Booth Memorial Hospital in Queens by New York Hospital, which is associated with the Cornell Medical Center. As stated above, this facility, now known as New York Hospital Queens, is on its way to being a major tertiary care teaching hospital, and, with reasonable certainty, will be a vigorous competitor with the merged hospitals, certainly in Queens County.

Furthermore, any attempts to distinguish LIJ and NSM based on their "reputations" as teaching facilities and providers of tertiary care must fail for two reasons. First, the Court finds that although several witnesses testified that both LIJ and NSM have a certain "cachet," there is another teaching facility in the area which performs similar services, namely. Winthrop, which has merged with South Nassau Communities Hospital and may also become affiliated with five major Catholic hospitals, two of those hospitals located in Nassau. Winthrop has become a formidable competitor, especially in cardiac services. The NSM strategic plan, drawn prior to the merger, acknowledged that Winthrop "is competing fiercely with NSUH–M's market position" (Pl.Ex. 22 at NSTP0048625). Every witness in this case who was questioned on the subject, testified that Winthrop is an excellent, premier, tertiary care teaching hospital.

Second, with respect to tertiary, services, the evidence is clear that people will travel to Manhattan to seek medical treatment. As set forth above, last year alone, approximately 9,000 Queens, Nassau and Suffolk patients sought cardiac treatment in Manhattan, and 50,000 traveled to Manhattan for all types of treatment. Accordingly, to the extent that there is a relevant product market to be considered, the Court finds that it would be for general acute care inpatient hospital services, rather than the provision of these ser-

vices by anchor hospitals. *Accord Freeman Hosp.,* 69 F.3d at 268; *University Health,* 938 F.2d at 1211; *Butterworth Health Corp.,* 946 F.Supp. at 1290; *Mercy Health Servs.,* 902 F.Supp. at 976.

Also, the Court finds that the Government's characterization of an anchor hospital as a relevant product market is unnecessarily restrictive in that it fails to take into consideration the dynamics of the marketplace. This subject was discussed in *Belfiore v. New York Times Co.,* 826 F.2d 177, 180 (2d Cir. 1987), an antitrust case involving newspaper home delivery:

> In the district court, plaintiffs alleged that the Times monopolizes the "general interest daily newspapers directed primarily to upscale readers" market.... As the district court noted, this market definition is implausible as a theoretical matter. Plaintiffs' narrow definition is an awkward attempt to conform their theory to the facts they alleged; this market definition does not reflect any relevant market evidenced in the record.

*Id.* at 180. (Citing *U.S. v. Grinnell Corp.,* 384 U.S. 563, 590–91, 86 S.Ct. 1698, 1713–14, 16 L.Ed.2d 778 [1966] [Fortas, J., with Stewart, J., dissenting] [criticizing narrow market definitions tailored only to those activities in which defendants engage; relevant market includes alternative sources of and substitutes for defendants' product reflecting "commercial realities."]). Accordingly, the Court finds that the relevant product market is the general acute care inpatient hospital services.

■ Even if the Government's definition of the relevant product market involving "anchor" hospitals was appropriate, it cannot prevail. The Court finds that Winthrop, which is a teaching facility providing primary, secondary and tertiary health care services, qualifies as an anchor hospital. In addition to the testimony of various witnesses supporting this conclusion, including Wheeler and Dr. Stocker, the Court notes again that U.S. News & World Report recently ranked Winthrop as one of the nation's top 100 hospitals. Moreover, the plaintiff's own expert witness, DOJ economist Dr. Vist-

nes, admitted that Winthrop provides essentially the same services as LIJ and NSM.

Thus, the Court finds that the Government failed to establish its definition of the relevant product market as an anchor hospital providing primary/secondary service. However, to complete the record, the Court will review and determine the remaining material issues in the case.

### C. *The Relevant Geographic Market*

■ A geographic market is that area "to which consumers can practically turn for alternative sources of the product and in which the antitrust defendants face competition." *Freeman Hosp.,* 69 F.3d at 268; (quoting *Morgenstern,* 29 F.3d at 1296); *Butterworth Health Corp.,* 946 F.Supp. at 1290. The critical question is where can consumers of the product involved practically turn for alternative sources of the product should the merger be consummated and the merged hospitals prices increase. *Mercy Health Servs.,* 902 F.Supp. at 975–76. Determination of the relevant geographic market is highly fact sensitive. *Freeman Hosp.,* 69 F.3d at 271 n. 16; *Butterworth Health Corp.,* 946 F.Supp. at 1291.

■ Predictably, the parties have widely divergent views of the geographic market within which the merging hospitals compete. The Government's definition of the relevant geographic market vacillated throughout the proceeding. In its moving papers, the Government did not set forth a clearly defined relevant geographic market. It stated, in imprecise terms, that the geographic market is an area in Nassau and Queens surrounding the two merging anchor hospitals, but not extending to Suffolk or Manhattan. The Government's expert, Dr. Vistnes, testified that the relevant geographic market has no defined borders; it may be the entire counties of Queens and Nassau, but his best estimate is "that the geographic market would be a region of approximately five miles from the two merging hospitals," without a precise boundary. (Tr. at 726). In its post-trial brief and at closing arguments, however, the Government firmly selected an outside boundary of Queens and Nassau Counties as the relevant geographic market.

The defendants maintain that the relevant geographic market includes Nassau, Queens, Western Suffolk and Manhattan. In support of their position, the hospitals rely on patient origin data (records of where people who receive medical care at certain hospitals reside), which demonstrates that LIJ and NSM draw patients from Queens, Nassau and Suffolk, and that patients residing in these areas also seek medical care in western Suffolk, Nassau, Queens and Manhattan.

As is often the case with such complex, fact sensitive issues, the reality lies somewhere in between the two versions. In the Court's view, the parties have oversimplified the relevant geographic market by attempting to impose a single market to their own advantage, where actually two such markets exist. *Accord Brown Shoe Co.*, 370 U.S. at 324, 82 S.Ct. at 1524 ("However, within this broad market, well-defined submarkets may exist which, in themselves, constitute product markets for antitrust purposes"); *Blue Cross & Blue Shield v. Marshfield Clinic*, 65 F.3d 1406, 1411 (7th Cir.1995) (recognizing how multiple markets may complicate an antitrust proceeding and discussing "submarkets" and a "series of linked geographic markets") *cert. denied* —— U.S. ——, 116 S.Ct. 1288, 134 L.Ed.2d 233 (1996); *U.S. Anchor Mfg., Inc. v. Rule Industries, Inc.*, 7 F.3d 986, 995 (11th Cir.1993) ("defining a 'submarket' is the equivalent of defining a relevant product market for antitrust purposes") *cert. denied*, 512 U.S. 1221, 114 S.Ct. 2710, 129 L.Ed.2d 837 (1994); *Butterworth Health Corp.*, 946 F.Supp. at 1293 (recognizing the possibility of two relevant geographic markets, one for general acute inpatient services, the other for primary care services).

On the one hand, there is evidence that in general, patients prefer to receive health care treatment relatively close to their homes. As Wheeler testified, when forming a hospital network it is important not to disrupt the preferences of physicians and patients. Further, several witnesses, including Wheeler and Wildzunas, testified that a network built around Manhattan hospitals would be untenable because people generally prefer to be hospitalized where they live. (Tr. at 103). Poirier reached a similar conclusion, recognizing that Empire is obligated "to provide its members with acute care in their backyard, where their families can visit them, where they feel comfortable, where their physicians practice medicine." (Tr. at 285–86).

Nevertheless, there was evidence adduced that large numbers of Queens, Nassau and Suffolk residents go to Manhattan hospitals for treatment. Vangeli of Cigna lauded the large, tertiary care hospitals in Manhattan and stated that Cigna enrollees "are willing to travel to Manhattan for certain services." (Tr. at 377). This is especially true with regard to tertiary care in the speciality fields of cancer treatment, cardiac surgery and complex orthopedic surgery. As stated above, in 1996, approximately 50,000 patients from Queens, Nassau and Suffolk traveled to Manhattan for treatment. Other statistics revealed that 15 percent of tertiary care patients from Queens, Nassau and Suffolk went to Manhattan hospitals. The Court agrees with the description of the Manhattan "submarket" described by Dr. Stocker:

Q With respect to the Nassau–Queens market, Doctor, what impact do [sic] the Manhattan market have on competition and on pricing do you think?

A Substantial.

Q Would you please describe that?

A Well, unlike most marketplaces it is only what, 15 miles or so to get to the Manhattan tertiary care hospitals. They are very big, very famous and very attractive. And they attract a lot of business from Long Island to their hospitals. So New York Hospital, Columbia, Sloan–Kettering, Beth Israel, are all hospitals that almost in any other marketplace, you would be lucky if you have one of them, and we have ten academic centers in there.

(Tr. at 1991).

Reviewing this evidence, the Court concludes that there are actually two relevant geographic markets in this case. The first geographic market is for primary and secondary care, which constitutes approximately 85 percent of the services provided by LIJ and NSM, and includes only Queens and Nassau. The Manhattan and Suffolk hospitals, including Stony Brook, are too far away

from the consumers in the NSM/LIJ sphere of influence, to provide reasonably suitable alternative care. The second geographic market is for tertiary care, and includes Manhattan, Queens, Nassau and western Suffolk County. (*See* testimony regarding "carve-outs," or the "process by which a managed care company can contract with a hospital for just some services, but not all services," Tr. at 2162–63); (*see* testimony regarding "steering" patients away from certain institutions, Tr. at 331–32, 406, 494).

Having reached this determination, the Court notes a significant corollary which must be kept in mind when reviewing the alleged anti-competitive effects of the merger. Once the existence of two geographic markets is established, the relevant product market also must be revised. As the plaintiff conceded at trial, it would be virtually impossible for the Government to obtain injunctive relief if Manhattan were included in the relevant geographic area, given the numerous alternative anchor hospitals located in that area. Accordingly, assuming that a viable relevant product market had been demonstrated with respect to general acute inpatient care, as opposed to acute inpatient care provided by an anchor hospital, the inclusion of Manhattan as part of the relevant geographic market for tertiary services, effectively limits the overall relevant market to primary/secondary care at hospitals in Queens and Nassau.

### D. Anti–Competitive Effects of the Merger

■ Although the Government has failed to establish its restrictive relevant product market, the Court nevertheless turns to the third prerequisite for a *prima facie* case, namely, the anti-competitive effects of the potential merger. This review will be made in the context of the relevant geographic market consisting of primary/secondary acute inpatient hospital care in Queens and Nassau. As set forth above, in order to be entitled to injunctive relief, the plaintiff must establish that the proposed merger would, with reasonable probability, have an anti-competitive effect in the future. *University Health*, 938 F.2d at 1218; *FTC v. Warner*

*Communications, Inc.,* 742 F.2d 1156, 1160 (9th Cir.1984); *Butterworth Health Corp.,* 946 F.Supp. at 1294; *Mercy Health Servs.,* 902 F.Supp. at 975.

■ Generally, anti-competitive effects, assuming the merging parties' large market share in the relevant markets, is a two-prong analysis. First, with reasonable probability, will the merged entity have enough market power to enable it to profitably increase prices above competitive levels for a substantial period of time? Second, will the merged entity with its increased market share and leverage, reduce the quality of care, treatment and medical services rendered?

As to the second prong, the Government does not seriously contend that the merger will cause such non-quantitative effects. The only evidence proffered in this regard was the opinion of Dr. Vistnes that the merger would cause a decreased incentive to respond to the requirements of their patient and less need to operate effectively to reduce costs. The Court finds that there is no credible evidence in this case that the merger of LIJ and NSHS will result in any reduced service to, or treatment of its patients. Nor is there any evidence that the merged hospital entity will not attempt to reduce costs. On the contrary, the Court finds that the principal reasons for this merger are to continue and advance the high quality of treatment of the hospitals' patients, to seek advancement of medical technology, to foster the education and training of its physicians, to further pursue medical research at both hospitals and to avoid duplication thereby reducing costs.

Therefore, the Court looks to the first prong, namely, whether there is a reasonable probability that the merged entity will increase prices above the competitive level for a prolonged period. In making a determination as to whether a merger will result in an anti-competitive effect, the courts have focused on whether the merger would likely cause the merged entity to wield sufficient market power to enable it to profitably increase prices. *E.I. du Pont de Nemours & Co.,* 351 U.S. at 391, 76 S.Ct. at 1005; *Archer–Daniels–Midland Co.,* 866 F.2d at 246. The crucial element that the Government must prove, namely, the probability of an

increase in prices, is emphasized in recent case law. In *Freeman*, 69 F.3d at 268, the Eighth Circuit stated:

> In order to meet its burden, the FTC is required to present evidence addressing, the crucial question of where consumers of acute care inpatient hospital services could practicably turn for alternative sources of the product should the Hospitals' merger be consummated and Joplin Hospital prices become anticompetitive. The FTC has failed to produce such evidence.

In *Mercy Health Servs.*, 902 F.Supp. at 975, the rule as to increased prices, was again set forth:

> Generally, the plaintiff attempts to prove its case by showing that the merged entity will have a large percentage of the relevant market such that, either individually or through collusion, its hold over the market will enable it to profitably raise prices above competitive levels.

*See also Coastal Fuels of Puerto Rico, Inc. v. Caribbean Petroleum Corp.*, 79 F.3d 182, 198 (1st Cir.), *cert. denied* — U.S. —, 117 S.Ct. 294, 136 L.Ed.2d 214 (1996) ("the touchstone of market definition is whether a hypothetical monopolist could raise prices"); (during closing arguments, counsel for the Government stated "The bottom line, your Honor, is Long Island Jewish and North Shore Manhasset can raise prices to managed care organizations after this transaction"). (Tr. at 2628).

In *FTC v. Staples, Inc.*, 970 F.Supp. 1066 (D.D.C.1997), the FTC successfully prevented Staples from merging with Office Depot, when the court found that the merged firm would be able to raise prices, because only one "office superstore" would remain. In *Staples*, the Court found that "direct evidence shows that by eliminating Staples' most significant ... rival, the merger would allow Staples to increase prices." *Id.* at 1082. Also, in *United States v. Vail Resorts, Inc.*, 62 Fed.Reg. 5037, 1997 WL 36727 (D.Col. Feb. 3, 1997), involving a proposed merger of all the available ski lifts in the relevant market, it was determined that the merged entity could unilaterally raise prices without risk of losing skiers to a competitor.

The foundation of the Government's case rests on the testimony of Dr. Vistnes that permitting this merger will result in a 20 percent price increase for primary/secondary services, and as a result, the MCOs "will be forced to pay on the order of $55,000,000 per year more to these hospitals." (Tr. at 566). He bases this prediction on his assessment that to avoid such a price increase, there would have to be an accompanying 20 percent loss of managed care patients, a result he finds to be inconceivable. Further, Dr. Vistnes stated that the not-for-profit status of the hospitals would not bar a price increase. However, significantly, Dr. Vistnes conceded that the presence of Winthrop, just four miles away, would probably influence the prices charged by the merged hospitals. (Tr. at 743). He also conceded that the speciality hospitals such as nearby St. Francis also "constrain" LIJ/NSM's pricing behavior. (Tr. at 755–56; 774–75).

Directly controverting Dr. Vistnes' opinion was the defense expert Guerin–Calvert, who testified that there would be no anti-competitive price increase. She based her opinion on: (1) the availability of alternative hospitals providing the same or similar services; (2) the entry and expansion of hospitals and other medical facilities in and entering the geographic market; (3) the current trends in the market, such as the excess capacity of hospitals and increasing managed care presence, which would preclude any such possibility; and (4) the mechanism available to managed care plans already in place. As to suitable alternatives, Guerin–Calvert testified that there are 35 hospitals in Queens, Nassau and Suffolk, and "literally every hospital in this area is providing the same primary/secondary services that are offered at LIJ and North Shore."

The problem with Dr. Vistnes' 20 percent price rise prediction is that it is unsupported by any of the fact witnesses, or any other evidence. In fact, the Court finds that this crucial opinion is totally speculative, Vangeli and Wildzunas testified that they did not know whether a merger would lead to increased prices. (Tr. at 412, 471, 549–52). Yasser stated that she had no information that prices would increase as a result of a

merger. Dr. Altman testified that a 20 percent increase would be a "financially devastating move". Dr. Dantzker testified that such a price increase is a "fairy tale" and would be "suicidal." (Tr. at 944–45). Although Poirier expressed concern regarding the effect of the merger on prices and stated that Empire would have to pay a non-competitive price rise by the merged entity, she conceded that, after the January 1, 1997 deregulation, of the 147 hospitals in her network, none have increased their rates. In any event, the Court finds that no hospital on Long Island has increased its prices after deregulation on January 1, 1997. In fact, the NSM and LIJ prices are presently lower than in 1996 and they are competitive. Poirier also testified that no hospital can turn away from Empire because of the number of "lives" it covers. However, Poirier further conceded that Dr. Stocker is the CEO of Empire, and that for public consumption, Dr. Stocker, not Poirier, speaks on behalf of the company. Dr. Stocker, a persuasive witness, soundly rejected all of Poirier's concerns. (Tr. at 1181, 1186, 1189–91).

Dr. Stocker, the spokesman for Empire, a prominent, multifaceted MCO, and with almost 5 million insureds, alleged to be the largest payer in the market (Tr. at 215–16), was of the opinion that the merger was "a good idea ... [and] would help drive down costs." Rather than being anti-competitive, he believed it would decrease prices:

Q And tell us, what is your opinion as to the benefits of this merger?

A I think it is a good idea. I think it would help drive down costs. I think it is consistent with what I talked about previously about integrated delivery system. If it doesn't happen I think our chances in this area of the market are less likely that we will be able to control costs, and that's my job, to control costs.

Q *What effect, Doctor, do you feel this merger would have on the prices charged to Empire and other managed care companies?*

A *They would decrease.*

\*　　\*　　\*　　\*　　\*　　\*

Q Doctor, do you think that after this merger, North Shore Hospital and Long Island Jewish combined will have the power to raise the combined hospital rates to Empire by 20 percent for the primary and secondary services they offer?

A No.

Q Do you have any reason to believe that they will have the power to raise prices to the extent of 20 percent, Doctor?

A Absolutely not.

Q As a matter of fact, Doctor, do you think they have enough cachet in the community to have the power to raise prices 20 percent?

A No.

(Tr. at 1200–01) (emphasis supplied).

Further, Dr. Stocker testified that if LIJ and NSM raised their prices by 20 percent Empire would drop them from their networks, as they have done in other situations with hospitals in Rockland County and in Connecticut and New Jersey. Similarly, Vangeli testified that in Brooklyn, Cigna replaced Maimonides Hospital, a prominent teaching hospital, with other Brooklyn hospitals. Vangeli had no information to lead him to believe that there would be a 20 percent price increase. The Court finds that the record is totally devoid of any evidence that the merged entity would raise prices in the future, no less a 20 percent increase. Accordingly, the Court declines to credit the testimony by Dr. Vistnes that the merger would prompt a 20 percent price rise.

Dr. Vistnes' unsupported opinion of a price rise is further diminished in significance when considered against the present state of the health care industry. Since deregulation in New York, health care rates, including hospital prices, have been steadily falling. Hospitals are underutilized and empty beds are common; a fertile field for price reduction. Further, NSM and LIJ have stipulated with the New York State Attorney General not to raise prices for at least two years after the merger is consummated. (Tr. at 1925–27, 1936–39; Def.Ex. ACF). Chairman Katz testified that this agreement is only a "cap" and it is anticipated that prices will be lower and continue to be driven down.

Insofar as market share is concerned, in *Mercy*, 902 F.Supp. at 975, it was stated that:

The government may make a prima facie showing that the merger will result in anticompetitive effects by showing that the merged entity will have an undue share of the relevant market. *Philadelphia National Bank*, 374 U.S. at 361–63, 83 S.Ct. at 1741; *University Health*, 938 F.2d at 1218.

Here, the Court finds that the merged entity will not have an undue share of the relevant product and geographic markets. The evidence reveals that in 1994, excluding newborns, LIJ had 7.7 percent of the Queens inpatient discharges and North Shore had 11.8 percent of the Nassau inpatient discharges. (Pl.Ex.175). In 1995, in Queens, Nassau and Suffolk, 12.9 percent of the patients came from the merging hospitals, with 87 percent of the patients in other hospitals. In fact, Dr. Vistnes testified that, for the 18–month period commencing January 1, 1995, LIJ and NSM accounted for only 11 percent of the "patient days" in Queens and Nassau. The remaining 89 percent of the "patient days" were at other hospitals. (Tr. at 728–29).

In sum, the evidence in this case indicates that, in the event the merger is consummated, it is unlikely that there will be a price increase. In addition to the factors set forth above, the makeup of the hospital population militates strongly against a price increase. Approximately 50 percent of their revenues are from Medicare and Medicaid patients and generally, the Government will set those prices. Of the remaining 50 percent, many of the patients are from Empire and HIP, whose leaders have testified in favor of the merger and have stated that they would seek available alternative hospitals if there was a price rise. The government failed to prove, by a preponderance of the evidence, that there is a reasonable probability of such an anti-competitive price rise, in the event the merger is consummated.

In the defined relevant product and geographic markets, the Government failed to prove, by a preponderance of the evidence, that the merged entity would, in all probability, produce an anti-competitive effect, by a price rise above competitive levels or a reduction in services. The Court reaches this conclusion despite the fact that presently LIJ and NSM are two of the premier teaching hospitals in Queens and Nassau, are direct competitors, and would be sought after by MCOs. In making this determination, the Court must balance the reduced competition and increased market share of the merged hospital against the suitable available alternatives, the multi-diverse economic forces that are driving down hospital populations and the efficiencies to be gained from such a merger.

Within 7 miles of LIJ, there are three premier tertiary care hospitals: Winthrop, New York Hospital Queens and St. Francis, who will be major competitors with the merged entity. The presence of these and other hospitals supplying the same services offered by LIJ/NSM and the ability of managed care plans to turn to these suppliers will, with reasonable certainty, constrain the pricing of the merged entity.

### E. *The Effect of the Not–For–Profit Status of the Hospitals*

The Court notes that LIJ and NSM are not-for-profit hospitals. The significance of "not-for-profit" status in a Section 7 Clayton Act case is unclear, and has been the subject of controversy by the courts and commentators. However, there are persuasive precedents that have declined to give any effect to such status. *See, e.g., NCAA v. Board of Regents*, 468 U.S. 85, 101 n. 23, 104 S.Ct. 2948, 2960, 82 L.Ed.2d 70 (1984) ("good motives will not validate an otherwise anticompetitive practice"); *American Society of Mechanical Engineers, Inc. v. Hydrolevel Corp.*, 456 U.S. 556, 576, 102 S.Ct. 1935, 1948, 72 L.Ed.2d 330 (1982) ("[I]t is beyond debate that nonprofit organizations can be held liable under the antitrust laws"); *United States v. Brown Univ.*, 5 F.3d 658, 665 (3d Cir.1993) ("Nonprofit organizations are not beyond the purview of the Sherman Act, because the absence of profit is no guarantee that an entity will act in the best interest of consumers.") *University Health, Inc.*, 938 F.2d at 1224 ("the non-profit status of the acquiring firm will not, *by itself*, help a defendant

146

overcome the perception of illegality that arises from the government's *prima facie* case") (emphasis supplied); *Hospital Corp. of America v. FTC*, 807 F.2d 1381, 1390 (7th Cir.1986) ("The adoption of the non-profit form does not change human nature ... it may make the management somewhat less beady-eyed in trying to control costs ...") *cert. denied* 481 U.S. 1038, 107 S.Ct. 1975, 95 L.Ed.2d 815 (1987).

Nevertheless, these cases, the Court deduces that while the not-for-profit status of the merging hospitals does not provide an exemption from the antitrust laws, this factor may be considered if supported by other evidence that such status would inhibit anti-competitive effects. In *Butterworth*, 946 F.Supp. at 1296, it was held that nonprofit status could be a relevant consideration if supported by other evidence that there would not be an anti-competitive result. Such evidence may include the testimony of the chairman of the hospital's Board with whom the merger idea originated. In *Butterworth*, the Board Chairman "testified convincingly that the proposed merger is motivated by a common desire to lower health care costs and improve the quality of care." *Id.* at 1297. *See also Freeman*, 911 F.Supp. at 1227 ("the merging hospitals' status as nonprofit entities must also be considered").

In *Carilion Health System*, 707 F.Supp. at 847, the nonprofit status of the merging hospitals was discussed:

> Defendants' nonprofit status also militates in favor of finding their combination reasonable. Defendants' boards of directors both include business leaders who can be expected to demand that the institutions use the savings achieved through the merger to reduce hospital charges, which are paid in many cases by employers, either directly or through insurance carriers.

■ In this case, both hospitals provide millions of dollars worth of free medical care to individuals in need. (Tr. at 1269–70). Any profit is funneled back into the community in the form of new programs and facilities. Therefore, it would appear that the same profit-maximizing incentives driving private companies are less central to the merging hospitals' progress. Consistent with the hospitals' altruistic motivations, the Court notes that the trustees of the merging entities include successful business and religious leaders who are not compensated for their services. All of these beneficial factors support the defendants' contention that community service not profit maximization, is the hospitals' mission.

Notwithstanding the proven good intentions of the members of the Boards of both hospitals, the Court considers but gives only limited and non-determinative effect to the not-for-profit status. In so doing, the Court finds no evidence of an intent to act in an anti-competitive manner by any person in either of the hospitals. To the contrary, the Court finds that the hospitals' Boards and administration apparently have the highest motives to provide the best quality and most efficient health care. However, as stated in *Mercy Health Servs.*:

> [T]he fact remains that for antitrust analysis, the court must assume that new and different Board members can take control of the corporation, and that if there is the potential for anticompetitive behavior, there is nothing inherent in the structure of the corporate board or the nonprofit status of the hospitals which would operated to stop any anticompetitive behavior.

902 F.Supp. at 988.

## F. *The Alleged Efficiencies Resulting from the Proposed Merger*

■ As stated in the Horizontal Merger Guidelines of the United States Department of Justice and the Federal Trade Commission (Revised 4/8/97) ("Merger Guidelines"), Section 4.0:

> Efficiencies generated through merger can enhance the merged firm's ability and incentive to compete, which may result in lower prices, improved quality, enhanced service, or new products.

The Merger Guidelines acknowledge that the realization of efficiency benefits often is the impetus for merger transactions. The courts have recognized that "in certain circumstances, a defendant may rebut the gov-

ernment's *prima facie* case with evidence that the intended merger would create ·significant efficiencies in the relevant market." *University Health*, 938 F.2d at 1222; *Mercy Health Servs.*, 902 F.Supp. at 987. For example, in *Rockford*, it was noted that there was the potential for 40 million dollars in savings in the first five years following the merger. In this regard, the · defendants must show that the intended merger itself, rather than any other factor, would result in significant economies and that these economies ultimately would benefit the consumers. *University Health*, 938 F.2d at 1223. The . defendants must establish that the proposed merger enhances rather than hinders competition as a result of the gained efficiencies. *See United States v. Country Lake Foods, Inc.*, 754 F.Supp. 669, 680 (D.Minn.1990).

This *de facto* defense is a difficult one to pursue because the alleged efficiencies are often speculative and vigorously disputed by the testimony of contradicting experts. In addition, the extent to which these efficiencies would enure to the benefit of the consumer is often difficult to measure. In sum, based on a review of the cases, the Court finds that, with regard to the so-called "efficiencies defense," the defendants must clearly demonstrate that the proposed merger itself will, in fact, create a net economic benefit for the health care consumer.

The hospitals assert that any potential anti-competitive effect of the merger is out weighed by the efficiencies. Unlike other mergers, the two hospitals in this case are very close geographically, which raises the possibility of greater cost containment and the avoidance of duplication of efforts and services. Turning to the evidence, the Court is faced with the usual battle of opposing experts. Testifying on behalf of the defendants was Robert Davis, an expert in efficiencies in hospital mergers. Davis is employed as a principal in health care matters in the accounting firm of Ernst & Young. He described the many computations he made in the various fields of expenditures and summarized his opinion as to the efficiencies to be generated by the proposed merger, as follows:

Q And what is your opinion as to the opportunities for cost savings achievable through the proposed merger?

A On the operating side, the annual recurring savings that will begin and continue by the fifth year are in the· neighborhood of 92 million dollars. In addition we see capital avoidance approaching 80 million dollars, I believe the number is 78 million dollars.

Q In giving that response you made a distinction between operating savings and capital ordinance I believe as the term you used?

A Yes.

Q Could you explain the distinction and how it meets your analysis?

THE COURT: Before you do that do you say this merger will save 92 million dollars per year or totally?

THE WITNESS: *By year five it will save 92 million dollars a year, your Honor, and each year afterward it will save 92 million dollars, an additional 92 million dollars a year.*

THE COURT: And capital avoidance is one, that's one shot?

THE WITNESS: That will happen one time, sometime with in the five years, and it is one shot.

(Tr. at 1640–41) (emphasis supplied).

Rather than review these claimed efficiencies in detail,· which includes some fifty different items, the Court will annex the five charts which set forth this data (Def.Ex. ACC, Appendix Fig. B). The five categories enumerated by Davis are: corporate services and infrastructure, operational support services, clinical enterprise consolidation, clinical support services and asset preservation. The items specified run the gamut from eliminating many management, administrative and clinical employees, saving money on capital expenditures, economies in purchasing medical supplies, to reducing the enormous laundry bills of busy operating hospitals. Major savings include professional services, the information systems and physician support services.

Davis conceded that some of the efficiencies set forth in his charts may be difficult

to implement. The Court agrees. There is no doubt that the merger will create substantial efficiencies and savings, but the amount of these savings directly attributable to the merger alone is difficult to ascertain. There are many potential overlaps, namely, savings that could be achieved by individual independent actions by each of the hospitals separately as opposed to those obtained by virtue of the merger. In addition, eliminating management, administrative and lower level employees is a painful process and would require a commitment by the Board of Trustees that may be sorely tested. With regard to reducing personnel, Davis did not take into consideration substantial "start-up" costs and "termination compensation" for released employees.

The Government's witness on this subject was Dr. Robert Taylor, an expert in the area of efficiencies likely to result from a hospital merger. Dr. Taylor has considerable experience in this field, as a consultant for the Government and hospitals. He also has been appointed a monitor with regard to whether promised efficiencies have been achieved. Dr. Taylor has been involved as an efficiencies expert in a number of other hospital mergers and has testified in some major Section 7 antitrust cases. As in the case of the defendants' expert, rather than review the lengthy specific critique by Dr. Taylor of the claimed efficiencies by Davis, the Court will annex Dr. Taylor's analysis (Pl.Ex. 263, Appendix Fig. C).

Dr. Taylor's conclusions as to the potential cost savings as a result of the proposed merger, are as follows:

I believe in terms of annual operating savings, that there is, that *there is a reasonable potential of them saving about 6.3 million dollars annually.* And as regards capital avoidances, there is a potential for them to save about $800,000 in depreciation related charges to that capital on an annual basis which in the five year period we are losing [sic] here would be about four million across that period.

(Tr. at 2362) (emphasis supplied).

The Court notes that Dr. Taylor stated that a number of efficiencies cited by Davis were not merger-related because the two hospitals could agree to sell these services to each other and otherwise work together, even in the absence of a merger. According to Dr. Taylor, among these non-merger friendly transactions are sharing clinical laboratory services, claims recovery services and utilities. The Court disagrees with this theory. As noted above, LIJ and NSM are vigorous competitors, each a leading tertiary, teaching hospital, located within two miles of each other. In the absence of a merger, the Court doubts that such advantageous friendly cost saving transactions would occur.

In the Court's view, Taylor did establish some items in which certain alleged efficiencies were disproved. Some of these areas are reductions in human resources personnel, which can be accomplished without a merger, and claims recovery costs, which can be achieved if LIJ forms its own company and reduces expenses. Other claimed efficiencies disputed by Dr. Taylor, with some merit, involve the reduction of insurance premiums, interest expense savings, the ambulatory care building, the capital avoidance items and the claimed 30 million dollar savings with regard to a physicians primary care network. Also, as to the claimed 33 million dollar savings in faculty, which is the largest claimed savings, the Court agrees with Taylor that the two hospitals can, individually, downsize their own faculties.

However, the Court finds that there are efficiencies that would be achieved by the proposed merger. Among these merger-related savings are: a reduction in personnel in various departments of both hospitals, including the financial departments and pain management; some reduction in the cost of clinical laboratory services and medical supplies; claims recovery costs and utilities; laundry costs; in-house consulting services; and computer and information services. Also, there will be some capital avoidance savings in amounts difficult to ascertain.

Reviewing the testimony as to the claimed efficiencies in its totality, the Court finds the proposed merger will result in significant efficiencies in the form of annual operating savings in expenses in the sum of approximately 25 to 30 million dollars per year. In

addition, there will be some capital avoidance in an unknown amount.

The second prong of the "efficiencies" analysis is whether these savings would be passed on to the consumers. Both hospitals are not-for-profit organizations, and the Court finds that both have a genuine commitment to help their communities. This finding would be some circumstantial evidence that the cost savings would ultimately enure to the benefit of the consumers. Moreover, in this case, the hospitals have entered into an agreement with the Attorney General of the State of New York, (Def.Ex.ACF), which provides in part that the merged hospitals "will pass on to the community cost savings that will be achieved ... [to] equal 100 million dollars during the five-year period commencing January 1, 1998." The agreement further provides that up to 50 million dollars of the cost savings my be used "to fulfill its mission to provide high quality health care to economically disadvantaged and elderly members of the community." In addition, the hospitals guarantee to the community a minimum of 50 million dollars. Therefore, the Court finds that, with reasonable certainty, the "efficiencies" gained in this merger will ultimately result in benefits to the consumers.

### G. *Entry*

█ A merger is not likely to cause an anti-competitive effect if other participants can enter the relevant markets and reduce the likelihood of a price increase above competitive levels. This concept is referred to as "entry." In its post-trial brief, the Governments states that "new anchor hospitals are not likely to enter the relevant market" (Pl. Post-trial Brief at 18). The Court disagrees. Initially, the Court notes that it has rejected the "anchor hospital" relevant product market theory. The evidence reveals and the Court foresees a new and emerging "entry" in the relevant product and geographic markets, namely, New York Hospital Queens, located within 7 miles of LIJ. Owned and financed by New York Hospital in Manhattan, affiliated with Cornell University Medical School, and already a primary and secondary service facility with a newly installed cardiac surgery department, and competing in cancer services (Pl.Ex.22), this facility will soon attain the status of a leading teaching and tertiary care hospital. If not already, it will shortly be a meaningful presence in Queens County, a major part of the relevant geographic market. New York Hospital Queens fulfills all the merger guidelines entry criteria, namely, the likelihood of its entry; the timeliness of its entry; and the sufficiency of its entry. (*See* Hospital Merger Guidelines §§ 3.0, 3.1; Dr. Vistnes testimony at p. 667).

In addition, there are other medical care facilities entering the relevant geographic market resulting from the increasing movement of Manhattan hospitals into Long Island. For example, as stated above, Mount Sinai has affiliated with Elmhurst General Hospital and has acquired and created physician and outpatient facilities in Queens, Nassau and Suffolk. The Court finds that all of these expansion driven facilities must be included in the "entry" field and will increase competition to the merging hospitals.

### III. *CONCLUSION*

The Court finds that, in the relevant product and geographic markets, the Government failed to prove that the merger of these hospitals will substantially lessen competition, increase hospital prices above competitive level or in any way reduce services at the merged entity. Further, the Court finds that there were many catalysts producing this merger, including the rapidly evolving and changing conditions in the present health care market, increasingly empty hospital beds, the managed care phenomena, competitive bidding caused by deregulation and reduced Government spending on Medicare and Medicaid.

Having reviewed the evidence presented at the hearing, and the parties' written presentations, and for the reasons set forth above, it is hereby

ORDERED, that the Government's request for a permanent injunction pursuant to Section 7 of the Clayton Act, 15 U.S.C. § 18, to prevent the merger of Long Island Jewish Hospital with the North Shore Health System, Inc., is denied; it is further

ORDERED, that judgment is directed in favor of the defendants dismissing the complaint; and it is further

**150**

ORDERED, that the Clerk of Court is directed to enter judgment in favor of the defendants.

SO ORDERED.

### APPENDIX

Figure A: Def.Ex. CA—"Mount Sinai Is Extending Its Medical Coverage."

Figure B: Def.Ex. ACC—The Davis computations detailing the alleged efficiencies resulting from this merger.

Figure C: Pl.Ex. 263—Detailed critique of the Davis computations of the alleged efficiencies, by the plaintiff's expert Dr. Robert Taylor.

## FIGURE "A"

## MOUNT SINAI IS EXTENDING ITS MEDICAL COVERAGE.

The Mount Sinai Health System is currently a network of 25 hospitals, including The Mount Sinai Hospital, as well as 16 long-term care facilities.

And, in conjunction with associated medical staffs, we can provide a full range of care to all patients at every stage of life.

Everywhere in the metropolitan area.

Because our network extends to all five boroughs. Long Island. upstate New York. and New Jersey, where we've just formed our newest alliance — with the Saint Barnabas Health Care System. Its nine hospitals and six nursing homes make it New Jersey's largest health-care network.

We're also helping corporations keep their employ-ees healthy. With innovative ideas that are flexible enough to serve the specific needs of today's companies.

And through the Mount Sinai Health System Managed Care Network, we've made contracting easier for managed care companies and self-insured businesses.

In addition, doctors associated with our system affiliates have access to the world-renowned specialized care. teaching. and research at Mount Sinai.

When you're choosing a health plan, make sure it includes our system.

Because by working together, we've really put ourselves on the map.

Mount Sinai Health System

212-824-8010

FIGURE "B"

PROJECTED MERGER OPPORTUNITY
Compared to Base Expense for Combined Medical Centers

| Expense For: [1] | Category | Annual Expenses (in $ millions) | Projected Annual Recurring Savings (in $ Millions) | Percent Recurring Annual Savings | Area of Opportunity | One Time Capital Avoidance |
|---|---|---|---|---|---|---|
| | *I. Corporate Services and Infrastructur* | | | | | |
| L,S | Hospital Administration | 18.2 | 1.1 | 5.8% | Gen. Admin ($1.1M) | |
| L,S | Professional Services | 20.0 | 4.8 | 23.8% | Legal Srvcs ($1.2M), In-Hse Csltg. ($3.6M) | |
| L,S | Public Relations/Marketing | 2.1 | 0.3 | 14.4% | Public Affairs, Development | |
| L,S | Human Resources | 7.5 | 1.0 | 13.6% | HR & Emp Hlth | |
| L,S | General & Patient Accounting | 34.7 | 4.3 | 12.4% | Claims Proc., Finance ($2.9M) | |
| L,S | Information Systems | 18.0 | 4.2 | 23.2% | IT, CIS, CPU Scope, Mainframe | 12.5 |
| L,S | Other Departments | 45.7 | 0.0 | 0.0% | | |
| | Totals for Corp. Srvcs. & Infra. | $146.2 | $15.7 | 10.7% | | $12.5 |

[1] L=LIJ, U=NSUH, S=NSHS

DEFENDANT'S EXHIBIT ACC

PROJECTED MERGER OPPORTUNITY
Compared to Base Expense for Combined Medical Centers

| Expense For: [1] | Category | Annual Expenses | Projected Annual Recurring Savings | Percent Recurring Annual Savings | Area of Opportunity | One Time Capital Avoidance |
|---|---|---|---|---|---|---|
| | | (in $ Million: ) | (in $ Millions) | | | |
| | *IV. Clinical Support Services* | | | | | |
| L,U | Home Health/Hospice | 33.9 | 0.8 | 2.5% | Home Care | |
| L,U | Diagnostic Imaging | 37.9 | 0.3 | 0.7% | MRI, Elim MRI, Amb Imging | 3.8 |
| L,S | Utilization Management | 5.9 | 0.3 | 4.3% | Quality Mgmt | |
| L,U | Emergency Department | 26.0 | 0.1 | 0.5% | Ambulance | 0.1 |
| L,U | Clinics | 42.5 | 0.2 | 0.4% | Hearing & Spch; Ambulatory Care Building | 12.0 |
| L,U | Other Functions | 79.0 | 0.0 | 0.0% | | |
| | Total Clinical Support Services | $225.2 | $1.7 | 0.8% | | $15.9 |

[1] L=LIJ, U=NSUH, S=NSHS

## PROJECTED MERGER OPPORTUNITY
### Compared to Base Expense for Combined Medical Centers

| Expense For:[1] | Category | Annual Expenses (in $ Millions) | Projected Annual Recurring Savings (in $ Millions) | Percent Recurring Annual Savings | Area of Opportunity | One Time Capital Avoidance (in $ Millions) |
|---|---|---|---|---|---|---|
| | *III. Clinical Enterprise Consolidation* | | | | | |
| L,U | Behavioral Medicine | 18.8 | 2.5 | 13.4% | Mental Hlth Srvs:Adult 1.4, Child 1.1, Capital incl. PET Scanner | 9.1 |
| U | Intensive Care | 51.7 | 0.0 | 0.0% | Future Potential | |
| L,U | Medical/Surgical Acute | 57.4 | 1.0 | 1.8% | Bone Marrow | 0.7 |
| | Pediatrics | - | - | - | Ped. Cardiology | 0.4 |
| L,S | Therapies | 32.1 | 0.1 | 0.4% | Pain Mgmt. | 0.8 |
| | Specialty Units | - | - | - | Nerology Location | 1.5 |
| | Cardiology | - | - | - | Heart/Lung, Cardiac Cath | 0.5 |
| L,U | Oncology | 14.4 | 0.7 | 5.1% | Amb. Chemo, Eliminate Expansion of Amb Chemo | |
| L,U | Physician Support | 196.1 | 37.7 | 19.2% | Faculty ($ 33.4M), MSO ($4.3M), Primary Care Network | 30.0 |
| L,U | Research | 5.2 | 1.1 | 20.7% | Research Administration | |
| L,S | Other Functions | 88.7 | 0.0 | 0.0% | | |
| | Total Clinical Enterprise Consolidation | $464.4 | $43.1 | 9.3% | | $43.0 |

[1] L=LIJ, U=NSUH, S=NSHS

PROJECTED MERGER OPPORTUNITY
Compared to Base Expense for Combined Medical Centers

| Expense For:[1] | Category | Annual Expenses (in $ Millions) | Projected Annual Recurring Savings (in $ Millions) | Percent Recurring Annual Savings | Area of Opportunity | One Time Capital Avoidance |
|---|---|---|---|---|---|---|
| | *II. Operational Support Services* | | | | | |
| L,S | Materials Management | 9.7 | 0.3 | 3.2% | Mat. Mgmt Staff | |
| | Medical Supplies | Allocated | 9.3 | | Supply Expense Reduction | |
| L,U | Pharmacy | 37.9 | 0.8 | 2.0% | Robotics, Management | |
| L,U | Laboratory | 50.0 | 2.5 | 4.9% | Core Lab @ Marginal Cost | |
| | Biomedical | Allocated | 0.4 | | Biomed | |
| L,U | Laundry & Linen | 5.2 | 0.3 | 5.9% | Laundry | |
| L,S | Plant Operations/Security | 40.1 | 1.9 | 4.9% | Facilities, Utilities ($1.6M) | 6.0 |
| L,U | Other General | 26.2 | 0.0 | 0.0% | Heliport Cost Avoidance | 1.0 |
| | Total Support Services | $169.1 | $15.5 | 9.2% | | $7.0 |

[1] L=LIJ, U=NSUH, S=NSHS

FIGURE "C"

## POTENTIAL SAVINGS OPPORTUNITIES FROM LIJ - NSHS MERGER

EXHIBIT
PX 263
CV 97-3412

**Davis Report (Plaintiff's Ex. 205)1/** **Taylor Report (Plaintiff's Ex. 262)**

| Page | Area | Claimed Savings 2/ | Page | Potential Savings Opportunity 3/ | Principal Flaws in Claimed Savings [Bracketed text reflects other comments] |
|---|---|---|---|---|---|
| | **I. Clinical Enterprise** | | | | |
| 5 | Faculty | $33,400,000 | 2 | $0 | Not merger specific; Faculty support themselves; Inconsistent with revenue goals |
| 8 | Research Administration | $1,077,000 | 6 | $0 | Rental value of NSHS space not included; Estimation inaccurate |
| 9 | Medical Service Organization | $4,300,000 | 9 | ($100,000) | [Potential to save 1 manager] |
| | | | | $0 | [Theoretical model not confirmed by actual data] |
| 10 | Clinical Patient Care Consolidations | $0 4/ | 11 | $480,000] | [Potential to save duplicate managers/directors] |
| 11 | Mental Health Services | $2,515,310 | 13 | $0 | Infeasible; Not merger specific |
| 11 | Bone Marrow Transplant | $1,035,000 | 17 | $278,500 | Not described; Potential to save 2 managers & 4 aides |
| 12 | Pain Management | $141,000 | 19 | $0 | Not described |
| 12 | Cancer Care | $740,000 | 20 | $0 | Not merger specific |
| 12 | Transplant | $0 4/ | 22 | $0 | Both CONs not likely to be granted |
| | **Total:** | **$43,208,310** | | **$858,500** | |
| | **II. Clinical Support** | | | | |
| 14 | Quality Management | $250,000 | 24 | $190,000 | Potential to save 2 managers @ $75,000 and 1 clerical @ $40,000 |
| 14 | Radiology | $252,000 | 25 | $0 | Staffing cost is proportional to volume |
| 14 | Ambulances/Transport | $132,000 | 27 | $132,000 | |
| 15 | Hearing and Speech | $150,000 | 28 | $150,000 | |
| 15 | Home Care | $838,000 | 29 | $160,000 | Not described; Potential to save 2 managers |
| | **Total:** | **$1,622,000** | | **$632,000** | |

1/ Davis Report is amended by revised pages submitted July 11 and 14, 1997 (Plaintiff's Exhibits 206 and 207).

2/ These dollar amounts correspond to the categories and amounts in the Davis Report (Plaintiff's Exhibits 205-207) and attempt to also reflect any changes in those amounts contained in subsequent exhibits submitted by defendants (Defendants' Exhibits ABH-ABK)

3/ For bracketed dollar amounts the savings properly established in the Davis Report is $0. However, based on my experience I would expect that s..vings of the amounts bracketed could be achieved (and data and sufficient supporting explanation to support that amount should have been provided in the Davis Report). It is not possible, based on the data and explanation provided to date, to determine whether it is reasonable to achieve savings exceeding the amount in brackets

4/ The initial savings claimed in the Davis report for this area appears to have been withdrawn in a subsequent exhibit submitted by defendants (Defendants' Exhibit ABH).

# POTENTIAL SAVINGS OPPORTUNITIES FROM LIJ - NSHS MERGER

Davis Report (Plaintiff's Ex. 205)1/ Taylor Report (Plaintiff's Ex. 262)

| Page | Area | Claimed Savings 2/ | Page | Potential Savings Opportunity 3/ | Principal Flaws in Claimed Savings [Bracketed text reflects other comments] |
|---|---|---|---|---|---|
| **III. Operational Support** | | | | | |
| 16 | Materials Management Staff | $315,000 | 31 | $100,000 | Potential to save 1 manager |
| 16 | Supply Cost Reductions | $9,335,000 | 32 | $0 | Unsupported assumptions |
| 17 | Home Infusion Pharmacy | $0 4/ | 35 | $0 | Not merger specific (LIJ has decided to close this service) |
| 18 | Pharmacy | $768,000 | 36 | $198,000 | Potential to save 1 manager and 1/6th robot economies |
| 18 | Clinical Lab | $2,455,000 | 36 | $0 | Not merger specific (hospitals can sell services to each other) |
| 19 | Biomedical Engineering | $425,000 | 41 | [$150,000] | [Potential to save 1 lab manager/director @ $150,000] |
| 20 | Laundry | $306,000 | 43 | $67,000 | Not merger specific; Potential to save 1 manager |
| 20 | Facilities | $340,000 | 44 | $0 | Not merger specific |
| 21 | Utilities | $1,606,000 | 45 | $190,000 | Potential to save 1 manager and 1 Clerical FTE |
| | | | | $0 | Not merger specific (savings available through joint purchasing) |
| | **Total:** | $15,550,000 | | $705,000 | |
| **IV. Corporate Services & Infrastructure** | | | | | |
| 22 | General Administration | $1,057,000 | 47 | $0 | Inaccurate calculations; More discussion needed. |
| | | | | [$500,000] | [Potential to save 5 managers @ $100,000] |
| 22 | Public Affairs | $170,000 | 49 | $136,000 | Potential to save 1.6 managers |
| 22 | Development | $130,000 | 50 | $90,000 | Potential to save 2 managers |
| 23 | Human Resources/Employee Health | $1,025,000 | 51 | $125,000 | Not merger specific; Unreasonable assumption; Potential to save 1 mgr/clerical in EH |
| | | | | [$500,000] | [Potential to save 5 HR managers @ $100,000] |
| 23 | In-House Management Consulting | $3,556,000 | 54 | $0 | Not merger specific |
| 24 | Legal Services | $1,200,000 | 56 | $0 | Not merger specific |
| 25 | Claims Recovery | $1,345,000 | 57 | $0 | Not merger specific (LIJ could purchase the service from NSHS) |
| 25 | Finance | $2,955,000 | 58 | $0 | More discussion needed |
| | | | | [$500,000] | [Potential to save 5 managers @ $100,000] |
| 26 | Information Technology | $4,180,000 | 60 | $0 | More discussion needed about LIJ's vendor and independent alternative |
| | | | | [$1,250,000] | [Potential to save $250,000 licenses, 6 operators & 6 programmers @$50,000 and 5 managers/supervisors @ $80,000] |
| | **Total:** | $15,618,000 | | $3,101,000 | |

1/ Davis Report is amended by revised pages submitted July 11 and 14, 1997 (Plaintiff's Exhibits 206 and 207).

2/ These dollar amounts correspond to the categories and amounts in the Davis Report (Plaintiff's Exhibits 205-207) and attempt to also reflect any changes in those amounts contained in subsequent exhibits submitted by defendants (Defendants' Exhibits ABH-ABK)

3/ For bracketed dollar amounts the savings properly established in the Davis Report is $0. However, based on my experience I would expect that savings of the amounts bracketed could be achieved (and data and sufficient suppo. ing explanation to support that amount should have been provided in the Davis Report). It is not possible, based on the data and explanation provided to date, to determine whether it is reasonable to achieve savings exceeding the amount in brackets.

4/ The initial savings claimed in the Davis report for this area appears to have been withdrawn in a subsequent exhibit submitted by defendants (Defendants' Exhibit ABH).

# POTENTIAL SAVINGS OPPORTUNITIES FROM LIJ - NSHS MERGER

**Davis Report (Plaintiff's Ex. 205)1/** **Taylor Report (Plaintiff's Ex. 262)**

| Page | Area | Claimed Savings 2/ | Page | Potential Savings Opportunity 3/ | Principal Flaws In Claimed Savings [Bracketed text reflects other comments] |
|---|---|---|---|---|---|
| **V. Asset Preservation** | | | | | |
| 28 | Interest | $5,000,000 | 62 | $0 | Not merger specific |
| 28 | Insurance | $6,000,000 | 65 | $0 | More discussion needed |
| | | | | [$500,000] | [Add LIJ to combined NSHS pool] |
| 28 | Capital Avoidance Interest | $5,200,000 | | $480,000 | 6% annual interest on $8,000,000 of potential capital avoidance |
| | **Total:** | $16,200,000 | | $980,000 | |
| | **Overall Annual Operating:** | $92,198,310 | | $3,276,500 | |

1/ Davis Report is amended by revised pages submitted July 11 and 14, 1997 (Plaintiff's Exhibits 206 and 207).

2/ These dollar amounts correspond to the categories and amounts in the Davis Report (Plaintiff's Exhibits 205-207) and attempt to also reflect any changes in those amounts contained in subsequent exhibits submitted by defendants (Defendants' Exhibits ABH-ABK).

3/ For bracketed dollar amounts the savings properly established in the Davis Report is $0. However, based on my experience I would expect that savings of the amounts bracketed could be achieved (and data and sufficient supporting explanation to support that amount should have been provided in the Davis Report). It is not possible, based on the data and explanation provided to date, to determine whether it is reasonable to achieve savings exceeding the amount in brackets.

# POTENTIAL SAVINGS OPPORTUNITIES FROM LIJ - NSHS MERGER

Davis Report (Plaintiff's Ex. 205)1/ Taylor Report (Plaintiff's Ex. 262)

| Page | Area | Claimed Savings 2/ | Page | Annual Depreciation 3/ | Principal Flaws In Claimed Savings |
|---|---|---|---|---|---|
| **VI. Capital Avoidance** | | | | | |
| 29 | Ambulatory Care Building | $12,000,000 | 67 | $0 | Significant costs not included |
| 29 | Heliport | $1,000,000 | 69 | $100,000 | Depreciate for 10 years at $100,000 per year |
| 29 | Primary Care Networks | $30,000,000 | 70 | $0 | Contrary to strategic plans |
| 29 | Adult Psych Routine Capital | $6,000,000 | 73 | $0 | More discussion needed |
| 29 | NHSU Adult Psych Expansion | $3,100,000 | 74 | $0 | Combination of this service may not be possible; More discussion needed |
| 29 | PET Scanner | $6,000,000 | 75 | $600,000 | Depreciate for 10 years at $600,000 per year |
| 29 | Pediatrics Cardiology Expansion | $650,000 | 76 | $0 | More discussion needed |
| 29 | OR Space | $2,000,000 | 77 | $0 | More discussion needed |
| 29 | Pain Management Expansion | $400,000 | 78 | $40,000 | Depreciate for 10 years at $40,000 per year |
| 29 | Cardiac Cath | $500,000 | 79 | $0 | More discussion needed |
| 29 | Heart/Lung Expansion | $995,000 | 79 | $0 | More discussion needed |
| 29 | Chemotherapy | $500,000 | 80 | $50,000 | Depreciate for 10 years at $50,000 per year |
| 29 | Neurology | $840,000 | 81 | $0 | More discussion needed |
| 30 | IS | $12,500,000 | 82 | $0 | Data and conclusions do not agree; Savings claimed for CPU even though already |
| 30 | MRI, diagnostic imaging, ambulance | $3,850,000 | 26 | $20,000 | MRI is a deferral, not avoidance. Potential to avoid purchasing 1 ambulance - $100,000 depreciated for 5 years |
| | **Total:** | $80,335,000 | | $810,000 | |

| | Claimed | Annual Depreciation |
|---|---|---|
| **Overall Annual Operating:** | $92,198,310 | $6,276,500 |
| **Overall Annual Capital:** | | $810,000 |
| **Overall Capital:** | $80,335,000 | $8,000,000 |

1/ Davis Report is amended by revised pages submitted July 11 and 14, 1997 (Plaintiff's Exhibits 206 and 207).

2/ These dollar amounts correspond to the categories and amounts in the Davis Report (Plaintiff's Exhibits 205-207) and attempt to also reflect any changes in those amounts contained in subsequent exhibits submitted by defendants (Defendants' Exhibits ABH-ABK)

3/ The Davis report states the total amount of capital expenditure that would be avoided for each savings claimed. The Taylor report states each allowed savings as an annual depreciation charge based on the asset's useful life.